DAVID P. NICHOLS, TREASURER OF THE STATE OF CONNECTICUT, *vs.* THE NEW HAVEN AND NORTHAMPTON COMPANY.

The General Assembly in 1822 incorporated the Farmington Canal Company, with a capital of $300,000, and in 1823 passed an additional resolution, in view of the public utility of the work and the importance of procuring subscribers to the stock of the company, providing that "the stock and income" of the company should be "forever exempt from taxation." The stock was soon after taken, and the company constructed and afterwards operated a canal from Long Island Sound to the north line of the state. In 1836, the canal company having become insolvent, the New Haven & Northampton Company was incorporated, with the same amount of capital, of which the creditors of the canal company were authorized to take in payment of their claims $165,000, and $135,000 was to be subscribed and paid in cash; and the new company was empowered to take a conveyance from the canal company of "all its franchises, rights, powers, privileges and immunities," and to "hold and enjoy the same in as full and ample a manner, to all intents and purposes, as the same had been held and enjoyed by said corporation," another section giving the company and its stockholders all the immunities conferred upon the canal company and its stockholders. This charter contained a provision, which the charter of the canal company had not contained, that it might be amended or repealed at the pleasure of the General Assembly. In 1846 the charter of the New Haven & Northampton Company was amended by giving the company power to construct and operate a railroad along or near the line of the canal, and to add to its capital stock by increasing the amount of each of its shares from $25, (the original par value) to $100, with a provision that "the capital stock hereby created shall be assessed at its just value in money and taxed at the same rate as personal estate." This amendment was formally accepted by the company, the additional capital raised, and the railroad built, the canal being abandoned under further authority from the General Assembly. In 1864 the General Assembly passed a general law requiring all railroad companies in October of each year to make a return to the comptroller of public accounts of the number of the shares of their stock, their market value, and the amount of their funded and floating indebtedness, on the first day of the month, and imposing upon them the payment of a sum equal to one per cent. of the mar-

ket value of such stock and of such funded and floating indebtedness.   This enactment was a part of a general statute with regard to taxation, which in express terms exempted "the stock and property of all incorporated companies which by their charters are expressly exempt from taxation." Held—

1.   That the tax laid by the statute was a tax upon the property, and not upon the franchise, of the railroad companies.

2.   That the New Haven & Northampton Company, in taking all the rights and immunities of the canal company, took the same exemption of its capital from taxation which the canal company had enjoyed.

3.   That when the exempted capital of $300,000 was increased, the whole capital did not become taxable by virtue of the provision of the amendment that "the capital stock hereby created shall be assessed and taxed," but only such part of the capital as was created by the amendment and added to the original capital.

4.   That the statute imposing a tax on all railroads was not to be regarded as repealing the exemption of the $300,000, because of the provision exempting from taxation the property of all incorporated companies whose property was exempted by their charters.

5.   That the change of the corporation from a canal company to a railroad company did not affect the exemption.

(Two Judges dissenting, and holding that the original exemption did not pass to the New Haven & Northampton Company, and that if it did, it was brought under the reserved power of repeal in the charter of that company, and was repealed by the statute.)

ACTION by the treasurer of the State, upon a statute authorizing such suit, for a state tax claimed to be due from the defendants; brought to the Superior Court in Hartford County. The declaration was as follows:

In an action upon a certain statute entitled, &c., whereupon the plaintiff, as such treasurer, declares and says, that he now is, and for a long time has been, treasurer of said State, and that on the first day of October, 1871, the defendants were, and for more than one year prior thereto had been, and ever since have been, a railroad company owning and operating a railway, lying partly within this state and partly within the state of Massachusetts; that the whole length of said railway was, at the time above named, ninety-nine and one hundredth miles, thirty-two and sixty-two hundredths thereof lying within the state of Massachusetts, and the remaining sixty-six and thirty-nine hundredths within this state; that on said first day of October, 1871, the market value of the stock of said company and their funded and floating indebtedness, less the amount of cash then actually on hand belonging to said

Nichols v. New Haven & Northampton Company.

company, amounted to the sum of $2,908,001.31, and that the secretary of said company afterwards, to wit, on the 18th day of October, 1871, made out under oath and delivered to the comptroller of public accounts a statement, in and by which the market value of the stock and funded and floating indebtedness of said company on said first day of October, 1871, less the amount of cash then actually on hand, was returned and set forth as hereinbefore alleged, which statement and valuation was approved by the board of equalization. And the plaintiff says that, by the provisions of the statute aforesaid, it became and was the duty of the defendants to pay to the plaintiff, as such treasurer, for the use of the state, on or before the 20th day of October, 1871, a sum equal to one per cent. upon such a proportion of the aforesaid market value of stock and funded and floating indebtedness, less said cash on hand, as the length of that part of the defendants' road lying within this state bears to the whole length of said road, as hereinbefore set forth; that the proportion of the aforesaid market value of stock and funded and floating indebtedness, less cash on hand, upon which said rate of one per cent. was required to be paid by virtue of said statute, and under the rates and apportionment aforesaid, was and is $1,949,926.34, and that the amount of said percentage which it was the duty of the defendants to pay on or before said 20th day of October, 1871, was and is the sum of $19,499.26. And the plaintiff says that the defendants, their duty aforesaid not regarding, did not on said 20th day of October, 1871, nor at any other time, pay to the plaintiff said sum last named, nor any part thereof, but on the contrary thereof then neglected and refused and have at all times neglected and refused so to do, contrary to the form of the statute in such case made and provided. Whereby an action has accrued to the plaintiff as such treasurer, to demand and recover of the defendants the amount aforesaid, with interest as damages, for and on account of the matters aforesaid. All which said several premises hereinbefore in this declaration set forth are to the damage of the

Nichols *v.* New Haven & Northampton Company.

plaintiff, in his official capacity, the sum of seventy-five thou-
sand dollars.*

---

\* The sections of the statute with regard to taxation, applicable to the present
case, are as follows: (Gen. Statutes, Rev. of 1866, p. 717; also found with some
alterations in Gen. Statutes, Rev. of 1875, p. 168.)

"SEC. 45.   The secretaries or treasurers of the several railroad companies and
horse railroad companies which have been or may hereafter be incorporated in
this state, shall, within the first ten days of October in each year, make out,
under oath, and deliver to the comptroller of public accounts, full and true lists
or statements of the number of shares of stock in their respective companies, the
amount of the funded and floating debt, the amount of cash on hand, the true
market value of each share of stock, and of their funded and floating indebted-
ness, on the first day of the month in which such lists or statements are herein
required to be made, the whole length of their respective roads, and the length
of those portions thereof, if any there are, lying without this state.

"SEC. 46.   Each of such railroad companies shall, on or before the twentieth
day of October in each year, pay, or cause to be paid, to the treasurer of this
state, for the use of the state, a sum equal to one per cent. of the market value
of the stock, and of the funded and floating debt of such company, whether the
stock and debt of such railroad company, or horse railroad company, is owned
by persons residing in this state or elsewhere, first deducting from such valuation
the amount of cash actually in hand; which valuation so made and approved,
or amended by the board of equalization, shall be regarded as fixing the basis or
measure of value of such railroad and horse railroad, their rights, franchises,
and property, within this state, for purposes of taxation; and this sum or tax
shall take the place, and be in lieu, of all other taxes on railroad and horse rail-
road property and franchises within this state; but when a railroad lies partly
within this state, and partly within some adjoining state or states, there shall be
paid only such proportion of the percentage herein required to be paid by said
companies respectively, on the value of such railroad property, estimated as afore-
said, as the length of that portion of the road which lies within this state, bears
to the whole length of the road; and when any tax hereby imposed upon the
property and franchises of any railroad company, or horse railroad company, be-
comes due, and such company shall not then be in the possession, and have the
management and control of its road, or the road bearing its name, each and
every person, railroad company, or corporation, then running, possessing, oper-
ating, or having the management and control of such railroad, or horse railroad,
either as trustee, assignee, agent, or lessee, shall be liable, and is hereby required,
to pay such tax, or cause it to be paid, to the treasurer of this state, for the use
of the state, within the time prescribed by this act for the payment of the same."

This act, originally enacted in 1851, and amended in 1864 only as to the
amount of the tax, was as first enacted and as carried into the revisions of 1866
and 1875 a part of a general statute with regard to taxation, which contained
an earlier section giving in detail the kinds of property exempt from taxation.
In this section among other specifications were the following:—" The stock or
property of all incorporated companies or communities, which by the terms of °
their charters or otherwise is expressly exempt from taxation."

The defendants filed the following plea in bar :—

The defendants in court say that the plaintiff ought not to have or maintain the aforesaid action thereof against them, because they say, that as to the sum of $19,499.26 which it is therein alleged it became the duty of the defendants to pay to the plaintiff· as treasurer for the use of the State of Connecticut, the defendants long prior to the commencement of this suit, to wit, on the 20th day of October, 1871, paid to the plaintiff as said treasurer, and to his acceptance, for the use of the State of Connecticut, a part thereof, to wit, the sum of $17,399.26. And the defendants, admitting all the allegations in said declaration contained upon which the supposed duty of the defendants as therein set forth is predicated, to pay said sum of $19,499.26 to the plaintiff as said treasurer, deny that by reason thereof, it became their duty to pay to the plaintiff as said treasurer on or before the 20th day of October, 1871, or at any other time, any sum for the use of the State in excess of said sum of $17,399.26 so paid by them as aforesaid; because they say, that the market value of the capital stock of said company on the 1st day of October, 1871, as contained in the valuation and statement delivered to the comptroller of public accounts by the secretary of said company, and approved by said board of equalization as is set forth in said declaration, was at the rate of seventy per cent. on the par value of the capital stock of said company; and they further say, that the General Assembly of the State of Connecticut at its May session, A. D. 1822, incorporated " The President, Directors and Company of the Farmington Canal," with power to construct a canal from tide water in the city of New Haven, through the state to the north line thereof, and directed in said act of incorporation that the capital stock of such corporation might amount to such sum or sums of money as should be necessary to carry into complete effect the entire object of said corporation, as by said act which is made part of this plea will fully appear; that the General Assembly at its May session, A. D. 1823, reciting that said company had been incorporated for

constructing a canal from tide waters in New Haven to the Massachusetts line, and that said canal, if completed, would be of great public utility, for the therein declared purpose of inducing persons to subscribe for the stock of said company, enacted that the stock and income of said corporation should be forever exempt from taxation, as by said act which is made part of this plea will fully appear; and said President, Directors and Company of the Farmington Canal thereupon, its capital stock being first subscribed for, proceeded to construct and did construct a canal from tide waters in the city of New Haven to the Massachusetts line, and necessarily expended in effecting that object and carrying the same into complete effect, the sum of $300,000, which sum, prior to the incorporation of the said defendants, as hereinafter stated, constituted the capital stock of said corporation, and was so as aforesaid by virtue of said last mentioned enactment of said General Assembly exempt from taxation. And the de-defendants further say, that they were incorporated by the General Assembly at its May session, A. D. 1836, with a capital of $300,000, with power to receive from said corporation, The President, Directors and Company of Farmington Canal, a conveyance of all the franchises, rights, powers, privileges and immunities of said company, and thenceforth to hold and enjoy the same in as full and complete a manner as the same had theretofore been held, exercised and enjoyed by said corporation; and by said act of incorporation the duty was imposed upon them, after the aforesaid conveyance to them from said corporation, to construct and maintain bridges over said canal, and to keep the same and said canal in repairs, as by said act of incorporation making part of this plea will appear. And that afterwards, to wit, on the 23d day of June, A. D. 1836, the said President, Directors and Company of the Farmington Canal, in pursuance of said last mentioned resolution of the General Assembly, by valid deed of conveyance of that date, assigned, transferred and conveyed to the defendants all the franchises, rights, powers, privileges and immunities of said corporation, to be held,

exercised and enjoyed by the defendants in as full and ample a manner, to all intents and purposes, as the same had heretofore been held, exercised and enjoyed by said corporation. And the defendants further say, that by a resolution of the General Assembly passed at its May session, A. D. 1846, they were authorized to construct a railroad from some convenient point on or near the canal basin in the city of New Haven, northerly, along or near the line of said Farmington canal, to the north line of the state; and for that purpose the capital stock of said company was by that and by subsequent resolutions of the General Assembly increased from said sum of $300,000 to the sum of $5,000,000, as by said several resolutions making part of this plea will appear; and in pursuance of said authority the defendants have constructed, and did on the 1st day of October, A. D. 1871, own and operate, said railroad, the same being in length sixty-six and thirty-nine hundredths miles, as in said declaration alleged, and being the same railroad therein mentioned. And the defendants further say that, by an act of the General Assembly passed at its May session, A. D. 1848, and which is made part of this plea, it was made lawful for the defendants to discontinue said canal, in the mode therein provided, and that in pursuance of this authority thereby conferred, said canal has been discontinued and the use thereof abandoned for more than twenty years last past. And the defendants aver that by reason of the premises, $300,000 of the capital stock of the defendants is exempt from taxation, and that by virtue of the aforesaid resolution of the General Assembly, and by reason of the premises, it did not, by reason of anything set forth in the plaintiff's declaration, become the duty of the defendants on said 20th day of October, A. D. 1871, to pay to the plaintiff as said treasurer one per cent. upon the then market value of said 300,000 dollars of their capital stock, the same being the sum of $2,100, and constituting the difference between said sum of $19,499.26 which in said declaration it is alleged it was the duty of the defendants on said day to pay to the plaintiff as said treasurer, and the sum of

$17,399.26, the amount so as aforesaid paid by the defendants on said 20th day of October, A. D. 1871, to the plaintiff as said treasurer to his acceptance, as hereinbefore set forth; and the defendants aver that by reason of the premises it did not become the duty of the defendants on said 20th day of October, A.D. 1871, to pay to the plaintiff as said treasurer any sum in excess of said sum of $17,399.26, so as aforesaid on said day paid by the defendants to the plaintiff as said treasurer. All of which they are ready to verify; wherefore they pray judgment, &c.

To this plea the plaintiff demurred, and the questions arising on the demurrer were reserved for the advice of this court.

The various provisions of the charters of the Farmington Canal Company and the New Haven & Northampton Company, important to the present case, are as follows:—

That of the Farmington Canal Company, which was granted in 1822, provided that the stock of the company should not be subject to taxation for twenty-one years after the canal was completed.

The stock, which was fixed at $300,000, not having been taken, the General Assembly, in the year 1823, passed the following resolution:—

"Whereas the General Assembly have incorporated companies for the purpose of constructing the Ousatonic Canal, a canal from Sharon to the boundaries of the State of New York, and also a canal from the tide waters in New Haven to the Massachusetts line; and whereas said canals, if completed, would be of great public utility; therefore, for the purpose of inducing persons to subscribe to the stock of said companies —Be it resolved by this Assembly, that the stock and income of each of said corporations shall be for ever exempt from taxation; provided however, that whenever, and so long as, the net annual income of either of said corporations shall exceed six per cent., and be less than twelve per cent. on its capital stock, said corporation shall annually pay to the treasurer of this State one-sixth part of such excess over six per cent., for the use of this State."

This addition to the charter of the canal company was accepted by a vote of the stockholders. Neither the original charter nor this amendment contained any provision reserving to the General Assembly the power to repeal or amend the charter.

In the year 1836 the Farmington Canal Company and the Hampshire and Hampden Canal Company, (the latter company being the owners of that part of the canal which lay within the limits of the state of Massachusetts,) having become insolvent, the defendants were incorporated under their present name, by a resolution passed that year by the General Assembly. The provisions of this resolution important to the present case are as follows:

"SEC. 2. The capital stock of the company hereby created shall not exceed the sum of three hundred thousand dollars, to be divided into shares of twenty-five dollars each; of which five thousand four hundred shares, or one hundred and thirty-five thousand dollars, shall be subscribed to be paid in cash.

"SEC. 3. The creditors of the Hampshire & Hampden Canal Company, and the creditors of the President, Directors and Company of the Farmington Canal, and all persons having claims against said companies respectively, may, within six months from the organization of the company hereby created, subscribe the amount of their debts or claims, the same being first liquidated, to the stock of this company, upon such terms as may have been agreed upon."

"SEC. 7. The company hereby created may receive from said Hampshire & Hampden Canal Company, and from the said President, Directors and Company of the Farmington Canal, a conveyance of all the franchises, rights, powers, privileges, and immunities of said companies, and thenceforth hold, exercise, and enjoy the same, within the respective limits of those companies, in as full and ample a manner to all intents and purposes, as the same have been heretofore held, exercised, and enjoyed by the said corporations respectively, for the purposes and with the limitations herein contained."

"SEC. 10. Whenever the said Hampshire & Hampden Canal Company, and the President, Directors and Company

of the Farmington Canal, shall pay to the company hereby created the full amount of all their debts assigned to it, and all such sums of money as this company may expend upon said canal, with interest on said debts, and moneys expended, together with all expenses which may in any case arise or be incurred by this company, in consequence of taking possession of said canal, and superintending and managing the same, after deducting therefrom the income of said canal, then all the rights of this company shall cease, and all the right and title conveyed to it by the Hampshire & Hampden Canal Company, and the President, Directors and Company of the Farmington Canal, shall be restored to and re-vested in those companies respectively.

"SEC. 11.    *    *    *    And said company hereby incorporated, and the stockholders therein, may thenceforth exercise all the powers, and enjoy all the privileges and immunities, conferred upon said old companies respectively and the stockholders therein."

"SEC. 14. This act may be altered, amended or repealed at the pleasure of the General Assembly."

In the year 1846 the charter of the defendants was amended, by giving them power to construct and operate a railroad along or near the line of the canal to the north line of the state. This amendment was accepted by the stockholders and the road subsequently built.   This amendment contained the following provisions:

"SEC. 2.   Said company is hereby authorized and empowered to add to the capital stock thereof, by increasing the nominal or par value of the present shares from twenty-five to one hundred dollars each share."

"SEC. 13. That the capital stock hereby created shall be assessed at its just value in money, and taxed at the same rate as personal estate.

"SEC. 14. That these resolutions shall not take effect till at a legal meeting called for that purpose by order of the directors, the stockholders of said company shall have assented thereto.

"SEC. 15.  Resolved further, that this act may be altered,

amended, or repealed, at the pleasure of the General Assembly."

A further amendment passed by the General Assembly in 1848 authorized the New Haven & Northampton Company to abandon the canal, and it was immediately after abandoned. Other amendments authorized a further increase of capital. but they are not important to the questions made in the case.

*Hubbard,* in support of the demurrer.

*First.* Conceding that the stock of the Farmington Canal Company was exempted from taxation, what measure of immunity did the defendants take?

1. Only an inconsiderable portion of the exemption claimed. Admitting that the whole stock of the old company was exempt, the whole stock of the new company did not, for that cause, become so, but to the extent only that the canal company stock made part of the stock of the new corporation; no further. But the stock of the new corporation was composed of three distinct elements, two of which did not have and are not entitled to have exemption, namely: 1st, the creditors of the Farmington Canal Company; 2d, the creditors of the Hampshire Canal Company; and 3d, the cash stock of $135,000 made up by outsiders and by friends of the old companies. The immunity conveyed to the new company was limited to the immunity possessed by the old, and this inhered in the tangible and taxable estate conveyed by the old corporation, and not in any other or additional estate contributed or acquired by the new. *Phila. & Wilmington R. R. Co.* v. *State of Maryland,* 10 How., 376; *Minot* v. *Phila. Wilm. & Baltimore R. R. Co.,* 18 Wall., 227.

2. The exemption of the old company transferred to the new became subject to the will of the General Assembly. For, 1st, by the charter of the new company the immunity to be conveyed by the old was to be held and enjoyed by the new " with the limitations herein contained," and 2d, one of the limitations therein contained was that the act might " be altered, amended, or repealed at the pleasure of the General Assembly." And this exemption is repealed by operation of

the statute on which this suit is brought, requiring "*all railroad companies which have been* or may hereafter be incorporated in this state" to pay to the treasurer of the state, subject to certain deductions, an annual duty therein named. This repeal does not impair any vested right. The privileges conferred on the new company were conferred as mere matter of grace. They were made revocable in terms. The State, in revoking, has merely exercised the power it reserved.

*Second.* The General Assembly in 1846, in giving the defendants very important additional powers, enacted as follows:—§ 2. "Said company is hereby authorized and empowered to add to its capital stock by increasing the nominal or par value of the present shares from twenty-five to one hundred dollars." § 13. "The capital stock hereby created shall be assessed at its just value in money, and taxed at the same rate as personal estate." § 15. "This act may be altered, amended, or repealed at the pleasure of the General Assembly." What, now, is the effect of these amendments on the preceding exemption?

1. The entire stock of the corporation was made taxable in terms. The canal company was by this resolve extinguished, and converted into a railroad corporation, pure and simple. Exemptions from taxation had become, at this time, as unfashionable in legislation as they had always been unwise. No railroad company in the state—not even those first formed, when the experiment was doubtful and capital timid, enjoyed such an exemption as is here claimed. Accordingly the legislature, to make an end of so odious a privilege, provided that the "capital stock hereby created" should be subject to taxation. What was the stock hereby created? The language should be construed strictly. Thus construed, it means the *shares* of stock thereby created; the old shares of twenty-five dollars each being extinguished and merged in new shares of one hundred dollars created in substitution. By the then existing system of taxation railroad stock was placed in the list of the shareholder at its market value. That the legislature intended to split shares and exempt merged and fractional parts of a share and subject the re-

mainder, is as improbable in supposition as the intent would have been awkward in execution. The system and machinery of taxation then existing pre-supposed that a share of stock was taxable in its entirety or not at all.

2. The preceding exemption was subjected to repeal and has, in fact, been repealed. The same reasons apply here as to the same point before made with regard to the former reservation of the power of repeal.

3. There was nothing in the character of the exemption that prevented the General Assembly from having full power to repeal it. *Town of New Haven* v. *Sheffield,* 30 Conn., 170; *English* v. *New Haven & Northampton Co.,* 32 id., 243; *City of Roxbury* v. *Boston & Providence R. R. Co.,* 6 Cush., 432; *Tomlinson* v. *Jessup,* 15 Wall., 458; *Sherman* v. *Smith,* 1 Black, 593; *In re Lee & Co.'s Bank,* 21 N. York, 9.

*Third.* The exemption of the canal corporation became extinguished by conversion of the latter into a railroad corporation, and by a diversion of the original franchise to a different purpose and use, with different powers and duties.

1. When the original canal company was formed, it was thought necessary to confer an exemption in order to invite capital to what was then a bold undertaking. When the new corporation abandoned the canal and became a railroad company, the state was full of competing railway companies. This changed condition of things would make the intention of the legislature to continue the exemption improbable *a priori.*

2. All modern decisions establish the doctrine that an exemption of this kind attached to a particular use ceases when the use is changed or diverted. "It was the obvious intention of the legislature," say our own court, " to exempt it (property given to charitable uses,) so long as it continued to the uses and purposes for which it was designed, *and it is a fair inference that whenever such property should be diverted from such use, the legislature intended that it should not be so exempt."* *Lord* v. *Town of Litchfield,* 36 Conn., 125. The Supreme Court of the United States hold the same doctrine. " This charter is a contract between the State of Missouri

and the corporators, that the property given for the charitable uses specified in it shall, *so long as it is applied to these uses,* be exempted from taxation." *Home of the Friendless* v. *Rouse,* 8 Wall., 436. "When the exemption is based on the use to which the estate is conveyed, it shall not be continued as attaching to the land beyond the time of its appropriation to that use." 10 Am. Law Reg., Aug., 1871, page 505, note.

*Fourth.* The tax in question is not a tax on property, but a tax on the franchise of the corporation, or rather on the corporation itself. So that, if the exemption claimed had been an exemption of all the property of the corporation, the tax would still be a legal one. *Coite* v. *Society for Savings,* 32 Conn., 173 ; *Coite* v. *Connecticut Mut. Life Ins. Co.,* 36 id., 527 ; *Society for Savings* v. *Coite,* 6 Wall., 606 ; *Commonwealth* v. *People's Five Cent Savings Bank,* 5 Allen, 431 ; *Commonwealth* v. *Provident Institution,* 12 id., 313 ; *S. C.,* 6 Wall., 611 ; *Hamilton Company* v. *State of Massachusetts,* id., 632 ; *Bank of Commerce* v. *New York City,* 2 Black, 620 ; *City of Bridgeport* v. *N. York & N. Haven R. R. Co.,* 36 Conn., 266 ; *People* v. *Commissioners of Taxes,* 23 N. York, 220 ; *Minot* v. *Phila. Wilm. & Baltimore R. R. Co.,* 18 Wall., 225, 231.

*J. S. Beach* and *Perkins,* contra.

1. By the act of 1823, *all the property* of the Farmington Canal Company was exempted from taxation. The expression is "stock and income." In *Town of New Haven* v. *City Bank,* 31 Conn., 106, it was decided that the expression "capital stock" included all the property of the bank, of every kind and description. The expression "stock and income" is still broader, and was evidently meant to include not only the property of the corporation, but its dividends also. In *Wilmington R. R. Co.* v. *Reid,* 13 Wall., 264, 269, it was held that where the charter exempted the "property" of a railroad, it thereby exempted the franchise.

2. This exemption passed to the New Haven & Northampton Company by the act of 1836. The expression there is

that the latter company should receive all the "rights, powers, privileges, and immunities" of the former. In *Humphrey* v. *Pegues*, 16 Wall., 244, one corporation, by an amendment to its charter, was given the "privileges" of another one, and it was held that an exemption of the stock from taxation was one of the most important privileges the old company had, and that the exemption passed by force of this word. The expression here, "privileges and immunities," is still stronger, and seems to have been used expressly to cover this exemption; certainly no stronger or more comprehensive form of words could have been used. The amendment of 1846 provides that the *additional* capital authorized thereby *should be taxed*, showing clearly, by implication, that it was understood that the former capital was not to be. If it had not been for this provision none of its capital would have been taxable, as in *State* v. *Norwich & Worcester R. R. Co.*, 30 Conn., 290, it was held that increasing the capital stock did not affect the exemption. It can make no difference that by the amendment of 1846, the defendants were authorized to construct and use a railroad instead of a canal. It was found that the old method of conveying persons and property was not sufficient to accommodate the public, and a new method, more desirable, was authorized. The corporation remained the same; its object, to transport persons and property, remained the same. The only change was that additional powers and increased means were given to it. It might as well be claimed that an addition to the defendants' charter, passed in 1848, giving them power to own and use steamboats, destroyed this exemption.

3. There is no reason to suppose that the legislature has ever intended or attempted to tax this stock. The exemption has never been repealed in express terms. If repealed by implication, it was only done by the general act which was passed substantially as it is now, in the years 1851 and 1864. Before 1851 individuals were taxed on the market value of railroad and other stock owned by them, and the corporation itself was not taxed at all. In 1851 the present law was passed, except that the rate was one-third of one per cent.

In 1864 it was changed to its present rate of one per cent.
If this had been all, there might be some color of claim that
the act extended to all railroads, were it not that the act of
1851 contained the clause at present found in the Revised
Statutes of 1866, p. 708, which expressly provides that the
stock theretofore exempted, shall continue so to be, and then
goes on to say that property not thus exempted shall be taxed
in the manner stated.   All the sections of the act should be
considered together, and comparing these two, the 6th and
24th, it is clear that the latter section was not intended to
apply to exempted stock.   To put it beyond all question, in
1856 the legislature passed a declaratory act, to the effect
that nothing contained in section 24, which imposed the tax,
should impair section 6, which exempts stock theretofore
exempted.   This declaratory act was omitted by the revisers
in 1866 as unnecessary, but it shows the intent of the legis-
lature, and in *State* v. *Norwich & Worcester R. R. Co.*, it was
held to be decisive of the question at issue here.   That deci-
sion is conclusive that the act of 1851 did not affect stock
theretofore exempted.

4.   But if the act of 1851 was intended to tax this ex-
empted stock, it would be void as impairing the obligation of
a contract.   The act of 1823 says that " for the purpose of
inducing persons to subscribe to the stock of said companies
it is resolved, that the stock of each of said companies shall
be exempted from taxation."   This is clearly a contract, a
consideration, and an agreement founded on it.   *State of
New Jersey* v. *Wilson*, 7 Cranch, 164; *State Bank of Ohio* v.
*Knoop*, 16 How., 384; *Humphrey* v. *Pegues*, 16 Wall., 244.

5.   The tax is a tax on the property of the corporation
and not on its franchise.   *Wilmington R. R. Co.* v. *Reid*,
13 Wall., 564; *Osborn* v. *N. York & N. Haven R. R. Co.*,
40 Conn., 491; *Bank of Commerce* v. *New York City*, 2 Black,
620; *Bank Tax case*, 2 Wall., 200; *Society for Savings* v.
*Coite*, 32 Conn., 173; *S. C.*, 6 Wall., 610; *Provident Institu-
tion* v. *State of Massachusetts*, 6 Wall., 629.

PARK, C. J.   The first question presented by this record

requires a consideration of the nature and character of the tax in controversy. Is it a tax imposed upon the property of the defendants, in contradistinction to a tax imposed upon the defendants themselves as a body politic?

If the tax is of this character, then another question arises, which is, are the defendants entitled to the exemption from taxation which was originally conferred upon the Farmington Canal Company?

These are the two leading questions in the case, and we will consider them in their order.

First, then, is the tax in question a tax upon property? We think it is, although the cases of *Coite v. The Society for Savings*, 32 Conn., 173, and *Coite v. The Connecticut Mutual Life Ins. Co.*, 36 Conn., 512, seem to countenance the contrary doctrine.

The court went, we think, to the verge of the law in those cases, in holding that the tax then in controversy was a tax upon the corporations themselves and not upon their property. The cases were, however, well considered, and are recent ones, and we do not feel disposed to disturb them. But we do not incline to go further in the same direction, as we should have to do, should we hold that the tax now in controversy is likewise a corporate tax.

The principal argument in support of the conclusions of the court in those cases was, that the statutes on which the cases were based, took no notice of the real value of the assets of the corporations. In *Coite v. The Society for Savings*, the court says:—" It [the statute] takes no notice of the manner in which this sum [the amount of the deposits] may be invested, or whether it is invested at all; and it never inquires into the profits, or losses, or conditions, or prospects, of the bank. If its assets double in value, it pays no more; if they decrease one-half, it pays no less. If they consist partly of forged notes not collectible, no allowance is made. Why then should a deduction be claimed when a like part is invested in notes not taxable merely?" The same argument was used in the other case referred to.

Chief Justice Denio uses the same reasoning in giving the

opinion of the Court of Appeals of the State of New York in the case of the *The Bank of the Commonwealth* v. *The Commissioners of Taxes*, 23 N. York, 220, in order to show that the tax in that case was a tax upon the corporation itself, and not upon its property. He says:—"It would seem plain enough that it is entirely immaterial what the assets of the bank then are. If the amount of the original nominal capital is alone to be taken into account, it would be officious and improper, or at least useless, for the assessors to make any examination or inquiry into the actual assets. If it could be shown that the discounted paper held by the bank, or the currency notes in its drawer, were forgeries, the assessors would not regard that circumstance; because the assets do not enter into the question, and are not made a part of the data by which the taxable valuation is to be ascertained. And for the same reason, when it was shown on behalf of the bank that its securities were not in their nature taxable, this circumstance became utterly immaterial, since neither the character nor amount of such securities have anything to do with the question which the taxing officers were to determine." But the statute on which the present case is based, is materially different in this respect. It takes notice of the real value of the assets of the corporations within its purview, in determining the amount of tax they shall pay; for it makes the "market value of the stock" the criterion in ascertaining the amount. The stock of a corporation represents its property, and the stock is valuable just in proportion to the amount of such property. The market value of the stock of a corporation, therefore, is the market value of all the property of the corporation in which the stock has been invested. If a corporation has not property enough to represent its entire stock, the stock is depreciated in value; it is below par. If the corporation has more property than enough to represent its entire stock, the stock is at a premium in the market; it is above its par value. Hence a tax imposed upon the market value of the stock of a corporation, must be a tax imposed upon the market value of the property of the corporation which repre-

sents the stock. Judge Nelson, in the *Bank Tax Case*, 2 Wallace, 200, says:—"It is not easy to separate the property in which the capital is invested from the capital itself. It requires some refinement to separate the two thus intimately blended together. The capital is not an ideal, fictitious, arbitrary sum of money set down in the articles of association, but, in the theory and practical operation of the system, is composed of substantial property, which gives value and solidity to the stock of the institution. It is the foundation of its credit in the business community. The legislature well knew the peculiar system under which these institutions were incorporated, and the working of it; and when providing for a tax upon their capital at a valuation, they could not but have intended a tax upon the property in which the capital had been invested." This language of Judge Nelson was used in a case where the legislature of the State of New York had passed a law rendering all banks and other moneyed corporations liable to taxation on a valuation equal to the amount of their capital paid in or secured to be paid in and their surplus earnings, and the question was, as here, whether the tax was imposed upon the institutions themselves, or upon their property. The case was not as strong as the case at bar in favor of a property taxation; for the capital was not taken, as it is here, at its market value, but at its nominal value. The case of the *Bank of Commerce* v. *New York City*, 2 Black, 620, is precisely analogous to the present case. In 1857 the State of New York directed that the capital stock of banks should be assessed and taxed "at their actual value." The question arose whether the law imposed the tax upon the corporations themselves or upon their property, and Judge Nelson in an elaborate opinion held that the tax was a property tax.

It is true that the same court in *The Delaware Railroad Tax Case*, 18 Wallace, 206, held the contrary doctrine. This case cannot be reconciled with the two well considered ones we have cited. It is a singular fact that the court, in giving its opinion in this case, makes no reference to those cases, although they had been very recently decided. No reason is

given for the opinion.   The opinion consists merely, so far
as relates to the question we are considering, in a naked
declaration that " the tax is neither imposed upon the shares
of the individual stockholders, nor upon the property of the
corporation, but is a tax upon the corporation itself, measured
by a percentage upon the cash value of a certain proportional
part of the shares of its capital stock."   We think the two
cases we have cited are by far the better authority.

Again, it is evident from the statute that it seeks to ascer-
tain the value of the property that railroad corporations
possess, and to tax that value.   Hence it takes, in the first
place, the market value of the stock of the corporations, and
then adds to that value their funded and floating debts ; for
the sum total of the market value of the stock and of the
funded and floating debts of a corporation is equal in amount
to the total value of the property that the corporation pos-
sesses.   This is clear.   If a corporation has only property
enough to pay its debts, its stock has no real value, and
ought not to have any market value.   If a corporation has
more property than enough to pay its debts, the stock has
some value ; and that value depends upon the excess of
property above what is required to pay the debts; for, the
debts of a corporation must be paid, and before we can come
to the value of the stock; property enough to pay these obli-
gations must be set aside, and the value of the stock will of
course depend upon the value of what remains.   Hence we
see, if the stock of a corporation is at its par value, it must
have property of some kind, consisting in its railroad, rolling
stock, franchise, privileges, immunities, or some other equiva-
lent, equal in value to the amount of its stock.   If the corpo-
ration is in debt, and the  stock still remains at its par value,
it must have additional property of some kind, equal in value
to the amount of the debts, or else the stock would be at a
discount.   Hence the statute taxes the market value of the
stock of a corporation and the amount of its funded and
floating debts ; for it must be taxed, like individuals, on all
the property it possesses, whether it is in debt or not.

The statute then goes on to say that the valuation thus

Nichols *v.* New Haven & Northampton Company.

obtained shall be regarded as fixing the *measure of value. of railroads*, and of *the rights, franchises, and property* of such corporations, for purposes of taxation, and that the tax shall be in lieu of *all other taxes on railroad property and franchises.* And then, as if to put at rest the question whether the tax imposed by it is a tax upon railroad corporations themselves or upon their property, the statute declares that, "when any tax hereby imposed upon the property and franchise of any railroad company becomes due, &c." This language of the statute declares the tax to be a tax upon *railroad property and franchises.* What further doubt then can there be upon the subject? The tax is upon every thing that belongs to railroad corporations which is valuable; and everything is included in the phrase "railroad property and franchises." This shows that the phrases "*railroad property and franchise of a corporation*," and "*the market value of its stock, together with its funded and floating debts*," are used in the statute as synonymous terms. They mean the same thing. The property is taxed, and the franchise is taxed. *State* v. *The Norwich & Worcester R. R. Co.*, 30 Conn., 290. This case seems to take it for granted that the tax is a tax upon the property of corporations. The case is a strong one, inferentially, as to the view we have taken of the question.

We are satisfied that the tax is a tax upon the property of the defendants.

But suppose that it were not so, but is to be regarded as a corporate tax irrespective of the defendants' property, still, are the defendants liable to pay the tax in controversy provided they are entitled to the exemption from taxation which was originally conferred upon the Farmington Canal Company? Or, in other words, assuming the tax to be upon the corpus of the defendants, would the Farmington Canal Company be liable to pay the sum in dispute, if they were now in existence operating their canal under their original charter, and the statute had included canal corporations within its provisions, as well as railroad corporations? This question has been ably discussed by the learned counsel who have argued the case.

Manifestly this question depends upon the solution of another; which is, did the immunity of the Farmington Canal Company include its body politic, as well as the property of the company? For, obviously, if the immunity extended to the body corporate of the company upon which the tax is assumed to be imposed, then nothing is gained to the State by making the claim that the tax is a corporate tax. The question then is, did the immunity extend to the corporation itself?

Suppose this question had arisen under a similar statute, as soon as the stock of the Farmington Canal Company had been taken and the capital paid in under the promise of the State that the stock of the company and its income up to six per cent. upon its capital should be forever free from taxation. What would be thought of the integrity of the State in saying to the stockholders in effect, " True it is that we promised that the stock and net income of the company up to six per cent. upon its capital should never be taxed, in order that the stock of the company might be taken; but we did not promise that the company itself should not be taxed in respect to its stock to the same extent as the stock would have been taxed if no promise had been made? The State can no more be guilty of fraud in making contracts, and justify itself, than can individuals; and how could it escape from the imputation of bad faith, should it seek to tax the company under such circumstances? A promise made to the stockholders of a company, enures to the benefit of the company; for the stockholders, in fact, are the company. All its property of every name and nature belongs to them; and a tax, therefore, in any form upon the company, is a tax, in reality, upon the stockholders of the company. The State knew this when the promise was made. It knew that, if the public were told that the promised exemption from taxation related *only to one form of taxation,* but under another form the corporation would be taxed, and that too to the same extent as it would otherwise have been taxed if no promise had been made, the stock of the company would never be taken. It knew, therefore, what construction the stock-

holders must have put upon the promise—that it was a promise of exemption from taxation in every form whatsoever, so far as the stock, and franchise, and property, and the company itself, were concerned. Such being the manifest import of the promise, every consideration of justice and honesty requires that it should have such construction. For, although the promise does not expressly include a tax upon the body politic, still, unless it is included, the State itself cannot show how the stockholders of the company could ever be benefited in the slightest degree by the exemption. The charter of the company pretends to hold out inducements to persons to subscribe for the stock. It says, " Whereas said canal, if completed, would be of great public utility; therefore, for the purpose of inducing persons to sub-scribe to the stock of said company, be it resolved, &c." There can be no escape from the conclusion that this language was intended for deception, unless the body politic of the company was intended to be included, and was included, in the promised exemption from taxation.

It is true that all exemptions from taxation are to be construed strictly in favor of the State, and against the grantee; but this principle has never been carried so far as to require courts to be governed by the strict letter of the grant, ignoring its manifest import, or so far as to justify bad faith in the making of such contracts.

It might be claimed with truth that the value of the franchise of a corporation enters into and forms a part of the value of the stock of the corporation. The franchise is valuable in proportion to the yearly net income which the corporation receives and is likely to receive in carrying on its business. The stock of the corporation derives its value, to a great extent, from the franchise and income together; and in some cases, these sources of value double and treble its nominal value. Hence the value of the stock of a corporation embraces the value of its franchise; and consequently, if the stock is exempt from taxation, so must the franchise likewise be exempt. *Wilmington Railroad Company* v. *Reid*, 13 Wallace, 264.

We entertain no doubt, therefore, that the immunity of the Farmington Canal Company extended to every form of taxation that could be imposed upon the company.

We come now to the last question presented by the record; which is, Are the defendants entitled to the exemption from taxation which was originally conferred upon the Farmington Canal Company?

In the year 1836 the Farmington Company and the Hampshire & Hampden Canal Company having failed and become bankrupt, a new company was chartered by the General Assembly, called the New Haven & Northampton Company. The capital stock of the new company was fixed by the charter at the sum of three hundred thousand dollars, which was the amount of stock of the old Farmington Canal Company. The charter of the new company provided that the creditors of the two bankrupt corporations might transfer their claims against those corporations to the new company, and take stock therein to the amount of their claims, not exceeding the sum of one hundred and sixty-five thousand dollars; and the new company was required to take these claims in payment of the stock thus taken. The balance of the capital stock, to wit, one hundred and thirty-five thousand dollars, was required to be paid in cash.

The seventh section of the charter was as follows:—" The company hereby created may receive from the Hampshire & Hampden Canal Company, and from the President, Directors and Company of the Farmington Canal, a conveyance of all the franchises, rights, powers, privileges and immunities of said companies, and thenceforth hold, exercise and enjoy the same within the respective limits of those companies, in as full and ample a manner, to all intents and purposes, as the same have been heretofore held, exercised and enjoyed by the said corporations respectively, for the purposes and with the limitations herein contained." The new corporation was organized according to the terms of the charter. And the first question in this part of the case is, did the seventh section of the charter transfer to, or create in, the new corporation, the exemption from taxation which the old company

had previously enjoyed ?    It should be observed that the
same necessity existed at this time for exempting the stock
and income of the new company from taxation as existed
originally.    The people of the state had not yet received the
great public benefit from the canal which had been expected,
and which induced the legislature to grant the original ex-
emption.    The old companies had not only expended their
capital in constructing the canal, but had likewise expended
one hundred and sixty-five thousand dollars belonging. to
their creditors, and had become bankrupt by so doing.    The
capital of the new corporation called for one hundred and
thirty-five thousand dollars in cash ; and those who should
take· this stock would have to take it with the rest of the
capital already expended in the project, whether it had been
judiciously expended or not.    The enterprise was still new
in the state and in the country, and there was very little
encouragement, as the matter presented itself to the minds
of moneyed men, to go further in the work.    More than half
the capital of the new company was to come from the old
company equitably entitled to the exemption ; and justice to
the old stockholders, and to the people of the state in general,
seemed to require that the project should not die, and all the
money that had been expended in the undertaking be lost.
The old companies had failed, and the new company was to
take their place ; was to step into their shoes, so to speak,
and go on with the undertaking.    It was all the same to the
State whether the work was to be performed by one company
or the other ; and they were entitled, if performing it, to the
same favor.    By granting this the State would create no
new immunity, but would be merely continuing one already
created.    It would seem that every consideration that induced
the grant originally, existed now with increased weight, and
required a continuance of the exemption.    If the seventh
section is read in the light of these circumstances, can any
one doubt that the legislature intended by it to continue the
exemption in the new. company; in order to do justice to the
creditors whose money·had been·expended in the enterprise,
and to induce persons to subscribe to the cash capital of the

corporation; so that the people of the state might enjoy the great public benefit expected from the canal. The language used certainly so imports. The new corporation was to " have all the *immunities* of the old corporations in as full and ample a manner to all intents and purposes as the same had been held and enjoyed, &c." This language can have no other meaning. It is susceptible of no other construction. The immunity of the old company extended to its entire stock of three hundred thousand dollars, and to its franchise. The immunity of the new company, therefore, was equally extensive. It embraced the entire capital and franchise. It seems to us there is no escape from this conclusion.

But, it is said that the immunity from taxation of the old corporation, was confined to its stockholders, and was not granted to the corporation itself; and that therefore the corporation transferred no immunity to the new corporation, for it had none to convey. This is making a distinction between the stockholders of a corporation and the corporation itself, when the language of the grant is, " the stock and income of the corporation shall be forever exempt," &c. Stockholders are not mentioned in the grant. The grant is directly to the body politic, for the benefit of its stockholders. At any rate, the legislature supposed that the old corporation had some immunity to convey, and intended that it should be conveyed; or else, again, they were guilty of fraud in holding out the deception; for it cannot be doubted that by it they obtained the organization of the new corporation, which they so much desired for the public good.

But, if anything more is needed upon this point, the question is put at rest by the eleventh section of the new charter. This section, after specifying various things which the new corporation should do, proceeds as follows:—" And said company hereby incorporated, and the stockholders therein, may thenceforth· exercise all the powers, and enjoy all the privileges and immunities conferred upon said old companies respectively, and the stockholders therein." Here, all the *immunities* conferred upon the *stockholders* of the old companies, as well as upon the *companies* themselves, are expressly

granted to the new corporation. If, therefore, the convey-
ance from the old corporations did not transfer the immunity
from taxation to the new corporation, this section *makes an
original express grant* to the new corporation, of immunity
from taxation to the same extent to which it had been
granted to the old corporations and their stockholders.   That
exemption extended to the entire stock and income of those
corporations; so this exemption must have extended to the
entire stock and income of the new corporation.

If further confirmation is needed upon this point, the case
still further furnishes it, in the fact that, in the year 1846,
the legislature authorized the defendants to increase their
capital stock from three hundred thousand to twelve hundred
thousand dollars, and *expressly made the additional capital
subject to taxation.* Was there any necessity for doing this,
if the existing capital was, at the time, so subject? Can
another instance be found in our legislation where this has
been done? It has been common, and still is, for legislatures
to authorize corporations to increase their capital stock; but
when this has been done, where is the instance in which the
legislature has taken the precaution to say that the increased
capital shall be subject to taxation, when the existing capital
was so subject? The instance cannot be found. The addi-
tional capital always takes its character from the existing
capital. If the existing capital is subject to taxation, so
would the additional capital be subject. If the existing capi-
tal is exempt from taxation, the additional capital would
likewise be exempt, unless the legislature should make it, as
here, subject to taxation. *State* v. *Norwich & Worcester R. R.
Co.*, 30 Conn., 290. The inference deduced from this act of
the legislature is almost as conclusive that the existing capital
of the company was not subject to taxation, as an express
declaration to that effect would have been.

We are satisfied that the defendants had an immunity from
taxation, co-extensive with that of the Farmington Canal
Company.

In passing from this question we cannot help observing,
that it seems remarkable that the organization of the new

corporation could have been procured under its charter, even with the immunity from taxation which we suppose to have been given by it, for it appears by the tenth section of the charter that the new company was required to run all the hazard of loss without any corresponding prospect of gain.   By that section the old companies could at any time re-possess themselves of the franchise and all the rights and property of the new company, by simply paying their debts transferred to the new company, and further paying them for all the time and money expended by the company upon the canal. So at that time it appeared that if the enterprise should turn out disastrously the new company must bear the loss, but that if profit should be made the old companies stood by to reap the benefit.   Under such circumstances, was it strange that the State should have continued the grant which had already been made?

But it is said that the legislature reserved to itself the right to alter, amend, or repeal the charter of the corporation, and that it exercised this right when it passed the statute on which this suit is brought, by repealing the clauses of the charter conferring the right of exemption from taxation.   The repeal is claimed on the ground that the statute and the charter are repugnant to each other, so far as the exemption is concerned, the statute therefore repealing this provision of the charter by necessary implication.   But the statute in another section contains a provision that the stock of corporations which had been exempted from taxation, should continue so to be.   We think there is nothing in this claim.   *State* v. *Norwich & Worcester R. R. Co.*, 30 Conn., 290.

, The next question grows out of the following facts.   It appears that the General Assembly in 1846 authorized the defendants, " to add to their capital stock by increasing the nominal or par value of the present shares from twenty-five to one hundred dollars," and to construct a railroad along the line of their canal.   The resolution authorizing them so to do provided as follows:—"The capital stock hereby created shall be assessed at its just value in money, and taxed at the

same rate as personal estate." The State claims that this change in the corporation converted the canal company into a railroad corporation, which conversion extinguished the canal company, and with it the exemption from taxation.

We do not so regard it. There was no change in the corporation itself. What was done consisted merely in authorizing a change from one mode of transportation to another. Certainly such a change could not affect the chartered rights of the corporation, especially when the legislature authorized it to be done without any intimation that the change would have any such effect. But it is claimed that the resolution subjects the entire capital to taxation, when increased according to its provisions. The taxable stock, however, is expressly limited to " the capital stock hereby created." If the addition to the capital stock had been made by adding shares to the number then existing, it would be manifest that the taxable stock would be confined to the shares thus added. And can the mere mode of adding to the capital stock make any difference? " Stock hereby created "—is the language. What was the stock then created by the act? Certainly not the old stock. That was as old as the corporation itself. We are unable to see any force in this claim.

Nor do we see anything substantial in other claims of the the State, which we have not particularly considered.

A majority of the court are satisfied that the plea of the defendants is sufficient. And we so advise the Superior Court.

In this opinion FOSTER and PARDEE, Js., concurred.

PHELPS, J. I am not able to concur in the conclusion at which a majority of the court have arrived. A brief review of the facts of the case will be necessary to a clear presentation of my views.

In 1822 the General Assembly passed a resolve incorporating the Farmington Canal Company with a capital of three hundred thousand dollars, and the ordinary privileges of such a corporation, with no reservation of the right of amendment,

alteration, or repeal.   The stock of the company was made exempt from taxation for the period of twenty-one years from and after the time the canal should be completed and in use. Under this charter the friends of the enterprise were unable to procure subscriptions to the stock, and for the expressed purpose of inducing persons to subscribe, the General Assembly the following year passed an additional resolution forever exempting, under a proviso unimportant to the present case, " the stock and income of the corporation."   The corporation in proper form and within the time prescribed assented to this resolution, and it thereby by legal adoption became a part of its original act of incorporation.   Under its charter thus enlarged the stock of the corporation was filled, and the canal constructed and operated until 1836, when the company became insolvent.   By a resolution of the General Assembly passed that year a new corporation was created under the name of the New Haven & Northampton Company, with a capital of three hundred thousand dollars, to be made up of new cash subscriptions for one hundred and thirty-five thousand dollars, and the remainder by subscriptions to the amount of their respective claims by the *creditors* of the Farmington Canal Company, and of the Hampshire & Hampden Canal Company of Massachusetts.   The corporation thus organized was successor to the Farmington Canal Company, and by a provision of its charter was authorized to, and did subsequently receive from the former a conveyance of all its franchises, rights, powers, privileges, and immunities, and was thereafter entitled to hold, exercise, and enjoy the same, in as full and ample a manner to all intents and purposes as the same had theretofore been held, exercised, and enjoyed by the Farmington Canal Company for the purposes and with the limitations in said charter contained.   The purposes for which the new corporation was organized were those ordinarily connected with and incidental to the operation of the canal, and a material limitation in its charter was the reserved right of amendment, alteration and repeal.

By another provision in its charter the corporation and stockholders were thenceforth authorized to exercise all the

powers and enjoy all the privileges and immunities conferred upon the former corporation and its stockholders.

The longer operation of the canal having become impracticable, the General Assembly in 1846, by a resolution amendatory of its charter, gave the New Haven & Northampton Company authority to construct a railroad along or near the line of its canal, with all the rights and powers necessary and ordinarily granted for the purpose, with a reservation in the usual form of the right of amendment, alteration and repeal. Under its charter so amended and accepted by the defendant its present railroad was constructed and has since been and is now being successfully operated.

This action is brought by the State in the name of its treasurer to recover from the defendant, as a tax for the year 1871, a sum equal to one per cent. of the market value of the capital stock of the defendant, and of its funded and floating debt, less the amount of its cash actually in hand.   The defendant does not contest its liability except with respect to three hundred thousand dollars of its capital stock which it claims is free from taxation under the resolution of 1823 forever exempting the stock and income of the Farmington Canal Company, and the question whether that privilege survives and has passed to the defendant is presented for our determination.

In the absence of clear and explicit language declaratory of the intention of the legislature, there is no presumption in favor of a perpetual privilege to a corporation conferring upon it immunity from taxation with which the public and corporations generally are burdened; but when it is clearly granted to a corporation holding a close charter it is irrevocable, because it is to that extent an unqualified renunciation by the State of its sovereignty over the subject matter.   It is also perpetual while it remains unsurrendered, and free from judgment of forfeiture, and while the subject in which it inheres continues to exist.

The language of the resolve of 1823 is peculiar in that it expresses the object of the exemption to be an inducement to individuals to take an interest in a public work by becoming subscribers to the stock of a corporation created and organ-

ized to carry it on, and thereby furnishing the means to complete and put it in operation. It proceeds upon the assumption that without such inducement the enterprise must fail. The stockholders are the persons solicited, and when we consider the object sought, and the method employed, there can be, I think, no reasonable doubt of the intention of the legislature to confer the benefit of the exemption exclusively on those through whose instrumentality the desired public improvement was to be secured. The consideration for the privilege moved entirely from the stockholders, and I think "the stock and income of the corporation" in the sense used, means only the property and interest of the purchasers of the shares, the persons who paid their money in consideration of the exemption and without the aid of whom the corporation would have been powerless, and its charter inoperative and valueless. If the Farmington Canal Company had so continued to exist as that the rights and interest of its shareholders had been preserved, there could be no doubt of the validity of their claim to the immunity; but in 1836 that corporation had become insolvent, and a new one under a separate and open charter and by a different name was created to succeed to it. It is true the new corporation was authorized and did receive a conveyance of all the franchises, rights, powers, privileges, and immunities, of the old, but under the construction which I have given to the resolution of 1823 the exemption claimed was not given to the Farmington Canal Company in such a manner as to make it transmissible by the corporation after the rights of the stockholders had become extinguished. The stock of the Farmington Canal Company was entirely absorbed, and those in whose interest and for whose benefit the exemption was given were no longer interested in the stock or income of the corporation. Only its creditors became interested as stockholders in the New Haven & Northampton Company. As such creditors they had no interest in the exemption, and the new corporation could receive none through them by virtue of their becoming stockholders in it to the amount represented by their claims against the former insolvent corporation. The extinction of the stock carried with it

the extinction of the privilege.　In other words, the subject in which the privilege inhered became extinct, and the privilege itself thereby became also extinct.

It is claimed that, under the clause in the charter of the New Haven & Northampton Company conferring on "the company thereby incorporated and upon the stockholders therein the right to exercise all the powers and enjoy all the privileges and immunities conferred upon the Farmington Canal Company and its stockholders," this immunity passed to the defendant.　If I am correct in what I have already said it disposes of this claim so far as the corporation is concerned. I may very properly add that by the terms of its charter the defendant's right to receive a conveyance of all the privileges and immunities of the old company was subject to the limitations therein contained, and we have seen that a very important limitation expressed was the right of alteration and repeal; and it seems to me clear that by the section of the statutes on which this suit is brought, the General Assembly so modified the defendant's charter as to withdraw from it the exemption claimed, if indeed it had in fact ever been conveyed to it.

If the new corporation ever had possessed the immunity it must have acquired it only by grant from the old.　There was no contract between the State and the new corporation except that contained in its charter.　That limits the nature of the enjoyment of all its powers and rights to a license during the pleasure of the General Assembly.　The General Assembly revoked the license when it passed the act on which this suit is brought, and if the immunity in question previously existed I think it was taken from the defendant by that exercise by the sovereign power of the reserved right of alteration and repeal.　If this reasoning is valid it applies with equal pertinence to both the corporation and its stockholders, and concludes them both.

Again, all that makes the defendant a railroad corporation is contained in the resolution amendatory of its charter passed in 1846, which was duly and formally accepted by it.　This acceptance was presumably with full knowledge of and with

reference to the statute of 1845, by the terms of which the acceptance by any corporation of any amendment or alteration of its charter operates to make the original charter and all resolutions amending or altering the same, subject to amendment, alteration and repeal at the pleasure of the General Assembly.   Under special circumstances this statute might operate to prevent a corporation from accepting valuable amendments to a close charter by compelling it to put at hazard some particular privilege perpetually secured to it, but we are not aware that its constitutionality could be questioned on the ground that it impaired the validity of existing contracts under which some special privilege had become legally vested, because by the acceptance of the amendment the right to the continuance of the privilege would be deemed to have been surrendered or intentionally waived.   In this case the contract between the State and the stockholders in the Farmington Canal Company had terminated by reason of the extinguishment of the interest of the latter, and therefore its validity could not have been impaired by any legislation by which, subsequently to 1836, the defendant was subjected to taxation. The tax in question which is imposed on every railroad corporation in the state is authorized by a statute passed after that time, and which must, I think, be regarded as so amending the charter of the defendant as to deprive it of any special immunity from taxation which it had previously enjoyed.

And I can not see that this result is avoided by a proper interpretation of the saving clause in the statutes relating to taxation, by which the stock and property of all incorporated companies and communities, which by the terms of their charters or otherwise are expressly exempted from taxation, are relieved from the burden of it.   In my judgment the defendant is not so exempt, and if in terms it appeared to be, the statutory provision just referred to, and the one on which this action is brought, are *pari materiâ*, and will stand together unless inconsistent with each other or with the intention of the legislature.   I discover no such inconsistency. It is obvious that the intention of the framers of the law was to impose this tax on railroad corporations either as a prop-

erty or a franchise tax, and to leave the saving referred to, to stand subject to such intention, and to such other as is contained in similar provisions with reference to other classes of corporations.

I concur fully with the views expressed by the majority of the court with regard to the claim made in behalf of the plaintiff, that the tax sought to be collected is imposed on the *franchise* of the defendant, and therefore payable even though the exemption claimed by the defendant was legally transmitted to it. I think it clearly a tax on the property and not on the franchise of the corporation. The cases decided by this court in which the tax was held to be imposed only on the franchise, were brought on statutes which in one essential particular differ in their phraseology from that on which this action is instituted. In neither of them, nor in those reported in Massachusetts, was the market value of the property of the corporation made, as it is in this case, the basis of taxation; and the fact that it was not, is prominent among the reasons assigned for holding that the respective taxes were laid upon the franchise and not upon the property of the several corporations. To decide this to be such a tax would require of us to take an important step in advance of the former determinations of this court, and abolish or disregard the important distinction to which I have referred.

In my opinion judgment should be rendered for the plaintiff.

In this opinion CARPENTER, J., concurred.