STATE OF MARYLAND *vs.* THE BALTIMORE AND OHIO
RAILROAD COMPANY.

*Act of 1826, ch. 123, incorporating the Baltimore and Ohio
Railroad Company—Sec. 18, Exempting the road, &c., from
Taxation—Such Exemption a Contract within the protection
of the Constitution of the United States and beyond the
power of a subsequent Legislature to repeal—Exemption of
the Franchises from Taxation—Exemption of Gross Receipts
derived from the exercise of such Franchises—Act of 1872,
ch. 234, imposing a State tax upon the Gross receipts of Rail-
road Companies, &c.—Gross receipts of the Balto. & Ohio
R. R. Co. which are exempt from Taxation—Buildings and
works necessary to the operation of the Railroad within the
meaning of its Charter—Elevators, wharves, &c., necessary
for the business of the Railroad as a Common Carrier—
Railroad not authorized by its Charter to carry on the
general business of a Warehouseman—Act of 1830, ch. 117—
Gross receipts which are liable to the Tax imposed by the Act
of 1872, ch. 234—Structures owned and used by the Railroad
Company which are Taxable according to Valuation as other
Real property—How far Hotels owned and used by the
Railroad Company are necessary to its business and there-
fore within its Charter—Hotels the Gross receipts of which
are exempt from Taxation—Hotels which are Taxable accord-
ing to Valuation as other Real property—Act of 1836, ch.
276, authorizing the Baltimore and Ohio Railroad to sub-
scribe towards the Construction of any Lateral or connecting
road—Gross receipts derived from the interest acquired in
such Lateral or connecting road, liable to the Tax imposed
by the Act of 1872—Gross receipts from the Metropolitan
Railroad, subject to the Tax imposed by the Act of 1872—*

4                          v. 48.

State *vs.* Balto. & Ohio Railroad Co.

*Rule for approximating to the receipts of the Metropolitan Railroad, where they have been mingled with those derived from the Main Stem—Receipts or dividends derived from the interest acquired by the Railroad Company in Steamship or Steamboat lines by virtue of the Franchise conferred by the Act of 1868, ch. 471, sec. 218, Liable to the Tax imposed by the Act of 1872—Interest received by the Balto. & Ohio Railroad Company on the Bonds of other Railroad Companies, Liable to the Tax imposed by the Act of 1872; If such Bonds are held outside of the Franchises of the Railroad Company, they are liable to be Taxed according to their market value—Receipts of the Railroad Company which are liable to the Tax imposed by the Act of 1872.*

Section 18, of the Act of 1826 ch. 123, incorporating the Baltimore and Ohio Railroad Company, provides "that the said road or roads with all their works, improvements and profits, and all the machinery of transportation used on said road, are hereby vested in the said company, incorporated by this Act, and their successors forever; and the shares of the capital stock of the said company shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burthen." Neither the Act of incorporation nor the Constitution of the State then in force, contained any provision reserving to the Legislature the right to repeal or amend the charter of the company. HELD:

1st. That the exemption from taxation granted in the charter of the company, was a contract between the State and the corporators, within the protection of the Constitution of the United States, and therefore beyond the power of a subsequent Legislature to repeal or in any manner impair.

2nd. That under the foregoing section of the Act incorporating the Baltimore and Ohio Railroad Company, the property and franchises of the company were exempt from taxation; and the franchises being exempt, the gross receipts derived from the exercise of such franchises were also exempt.

The Act of 1872, ch. 234, imposed a State tax of one-half of one per cent. upon the gross receipts of all railroad companies worked by steam, incorporated by or under the authority of the State and doing business therein. In an action by the State to recover from the Baltimore and Ohio Railroad Company the tax levied under this Act, on the gross receipts of the company from the 1st of April, 1872, to 31st of December, 1873, it was HELD:

State *vs.* Balto. & Ohio Railroad Co.

1st. That the gross receipts of the entire road of the defendant from Baltimore to the Ohio river, and the gross receipts derived from the lateral roads built by the defendant, and from all buildings and works necessary and expedient to the operation of its road, were exempt from the imposition of any tax or burthen; and this too whether said road or roads and buildings and works were constructed with money derived from the subscription to its capital stock, or from sales of its shares of stock, or from money borrowed and secured by mortgage, or from the undistributed profits of the company, or from all these sources combined.

2nd. That the buildings and works necessary and expedient to the operation of the road within the meaning of the defendant's charter, were such buildings and works as were reasonably convenient and appropriate to the maintenance and operation of the road.

3rd. That the elevators, wharves, piers and docks owned by the defendant were necessary for its business as a common carrier for the purposes of receiving and storing grain and freight shipped over its road after the same had reached the place of destination, and previous to its delivery to the consignee or owner; but as such common carrier it had no right to own and use these structures for the storage of grain and freight after the owner or consignee had had a reasonable time to remove the same.

4th. That the Act of 1826, ch. 123, did not authorize the defendant to carry on the general and ordinary business of a warehouseman; and if the Act of 1830, ch. 117, or any subsequent Act, did authorize the defendant to receive and charge for the storage of grain and other freight generally, the gross receipts derived from the exercise of this special privilege or franchise, were liable to the tax imposed by the Act of 1872, ch. 234.

5th. That if no such power had been conferred, and these structures were owned and used by the defendant for the purpose of carrying on a business, separate and distinct from its business and obligations as a carrier, then such structures were taxable according to valuation as other real property.

6th. That while the defendant was not authorized by its charter to build and conduct hotels for the accommodation of the public generally, hotels or buildings for the accommodation of passengers over its road, were necessary to its business, and therefore within its charter.

7th. That the Cumberland and Viaduct hotels being mainly designed, and at present used, for the accommodation of passengers over the defendant's road, and also for ticket and telegraph offices, and waiting rooms for passengers, the gross receipts derived from these hotels were exempt from taxation.

8th. That the Oakland and Deer Park hotels used primarily as places of summer resort, were not in any sense necessary to the operation of the

road, though they might attract travel over it; but the receipts from these hotels were not liable to the tax imposed by the Act of 1872, ch. 234, as they were not derived from the exercise of any franchise granted by the State, but the hotels were taxable according to valuation as other real property.

The authority given to the Baltimore and Ohio Railroad Company by the Act of 1836, ch. 276, to subscribe towards the construction of any lateral or connecting road, and to acquire an interest therein, not exceeding two-fifths of the estimated cost of constructing such road, is a distinct privilege or franchise granted to the company, and the gross receipts derived from the interest thus acquired in such lateral or connecting road, are liable to the tax levied by the Act of 1872.

The Metropolitan Railroad having been built, not under the provision in the original charter which authorized the Baltimore and Ohio Railroad Company to construct lateral roads, but under the Act of 1865, ch. 70, which did not exempt the projected road or its franchises from taxation, the gross receipts of the Metropolitan road are subject to the tax imposed by the Act of 1872; but no separate account having been kept of such receipts, they having been mingled with those derived from the Main stem of the Baltimore and Ohio Railroad, the only rule by which to approximate to the receipts of the former is to make them bear the same proportion to the entire gross receipts derived from the Main stem in the State, as the number of miles of the Metropolitan road bears to the entire length of the Baltimore and Ohio Railroad.

No power is conferred upon the Baltimore and Ohio Railroad Company by its charter to acquire or hold any interest in steamship or steamboat lines. Such power is granted by the Act of 1868, ch. 471, sec. 218, and being a separate and distinct franchise, the receipts or dividends derived from the interest acquired in such steamship or steamboat lines by virtue of the special franchise thus conferred, are liable to the gross receipt tax.

No power is conferred on the Baltimore and Ohio Railroad Company by its charter, to acquire the bonds of other railroad companies, and if they have been acquired under any subsequent grant from the Legislature, the interest received on such bonds is liable to the tax imposed by the Act of 1872. If, however, such bonds are held outside of the franchises of the railroad company, they are liable to taxation according to their market value, as other bonds.

The gross receipts derived from all properties and investments held and owned by the Baltimore and Ohio Railroad Company under franchises granted

State *vs*. Balto. & Ohio Railroad Co.

subsequent to its charter, and upon which no exemption from taxation was engrafted, are liable to the tax imposed by the Act of 1872. But only such gross receipts as are earned in the State.

APPEAL from the Superior Court of Baltimore City.

This was an action of debt brought on the 9th of September, 1876, by the appellant to recover from the appellee, the State tax of one-half of one per cent. levied under the Act of 1872, ch. 234, on the gross receipts of the defendant from all sources, (except from its Washington Branch,) from the 1st of April, 1872, to the 31st December, 1873, inclusive. The Act of 1872, ch. 234, was repealed and re-enacted with amendments by the Act of 1874, ch. 408, which provided that said repeal should not affect or impair any right vested or acquired, and existing at the time of said repeal under said Act. The case was tried before the Court without the intervention of a jury.

*First Exception.*—The plaintiff applied to the Court for an order requiring the defendant to make answer, verified by oath or affirmation, to certain interrogatories in the nature of a bill of discovery, to the end, that discovery might be made as to the nature, character and value of certain property of the company, and the amount of gross receipts derived from all sources from the 1st day of April, 1872, to the 31st day of December, 1873, except those received from the Company's Washington Branch Road. The Court (DOBBIN, J.) passed the order as prayed for. The defendant in so far as it deemed the interrogatories pertinent to the issue to be tried, answered them; but to such of them, or such parts of them as it deemed not pertinent to the issue, it excepted on that ground and declined to answer. The third and fourth of the interrogatories so excepted to, and to which reference is made in the opinion of this Court, were as follows:

3. Of what mortgage bonds, bonds, stocks and debts due to it was the said Baltimore and Ohio Railroad Com-

pany the owner between the 31st day of April, 1872, and December 31st, 1872, inclusive of said last mentioned day, and in the year ending December 31st, 1873; answer separately as to these different periods of time, and in your answer as to the property so owned at said different periods of time, state the amount and par value of each class of said mortgage bonds, bonds, stocks, and the aggregate of said debts so owned, including in your answer any stock of the Baltimore and Ohio Railroad Company which may form a part of the stocks so owned, whether the same be the stock of the Main Stem, or of the Washington Branch of the said road, and specifying the purpose for which such stock was so owned?

4. Upon which of said mortgage bonds, bonds and stocks so owned, was interest or dividends paid to the Baltimore and Ohio Railroad Company, and to what amounts between said 1st day of April, 1872, and said 31st day of December, 1872, inclusive of said last mentioned day, and on what part of said debt was interest paid to said Company in said period of time, and to what amount, and on which of said mortgage bonds, bonds and stocks so owned, was interest or dividends paid to the Baltimore and Ohio Railroad Company, and to what amount in the year ending December 31st, 1873, and on what part of said debt was interest paid to said Company in said last mentioned period of time, and to what amount?

The Court sustained the defendant's exceptions, and to this ruling the plaintiff excepted.

*Second Exception.*—A large amount of evidence, chiefly documentary, was introduced by the plaintiff. Among the documentary evidence so introduced were the following Maryland Acts of Assembly: 1826, ch. 123, 1827, ch. 104, 1827, ch. 209, 1835, ch. 245, 1835, ch. 395, 1836, ch. 82, 1836, ch. 276, 1845, ch. 313, 1854, ch. 34, 1865, ch. 70, 1866, ch. 154, 1866, ch. 157, 1868, ch. 119, 1868,

ch. 471, and 1870, ch. 362. The Acts of Congress of March 2, 1831, ch. 85, and July 25, 1866, ch. 251, were also introduced. The following Acts of the General Assembly of Virginia were also introduced: Act of March 8th, 1827, Act of March 11th, 1837, Act of March 28th, 1837, Act of April 2nd, 1838, Act of March 19th, 1839, Act of March 6th, 1847; and further, sections 58 and 59 of ch. 35 of the Code of Virginia of 1860, (2nd Ed.) and section 67 of ch. 29 of the Code of West Virginia of 1868. The plaintiff also offered in evidence the twenty-sixth, thirty-second, thirty-third, forty-sixth, forty-seventh and forty-eighth annual reports of the defendant, and copies of the following mortgages: From the defendant to William G. Harrison, dated 29th April, 1853; from the defendant to the Mayor and City Council of Baltimore, dated the 16th of February, 1854; from the defendant to John W. Garrett and others, trustees, dated 1st of March, 1870, and one from the said defendant to John W. Garrett and others, trustees, dated 20th of May, 1872. It was admitted that the indebtedness of the defendant intended to be created under and secured by the said respective mortgages, had been created and secured as provided for by said respective mortgages; and that the money received by the said defendant from or upon the evidences of debt secured by or under said respective mortgages, had been used and applied by the said defendant to the purposes expressed in said mortgages. Evidence was also introduced by the defendant. After the evidence was in, the plaintiff offered ten prayers—not deemed necessary to be set out—which the Court refused; and the plaintiff thereupon excepted. Verdict was given for the defendant and judgment was entered thereon. The plaintiff appealed.

The cause was argued before BARTOL, C. J., BOWIE, STEWART, BRENT, GRASON, MILLER, ALVEY and ROBINSON, J.

*John H. Handy* and *Charles J. M. Gwinn, Attorney General,* for the appellant.

The Court of Appeals in *Mayor, etc. vs. B. & O. R. R. Co.,* 6 *Gill,* 295, 296, laid down the general rule, that the exemption of the shares of stock of a corporation from taxation, exempted its property also from taxation.

The expression of this general rule was not necessary to the decision of the particular case; the rule, therefore, ought not to control the judgment of this Court, when the principle of that rule is involved in the determination of a new case. *Dugan vs. Hollins,* 13 *Md.,* 162; *Cohens vs. Virginia,* 6 *Wheat.,* 399–401; *Woodruff vs. Parham,* 8 *Wallace,* 137–139; *Carroll vs. Lessee of Carroll,* 16 *Howard,* 287.

Shares of stock in a corporation, in the hands of individual owners, and the franchises and property of such corporation, in its ownership, are not different forms of the same property. They are different properties, which are wholly distinct in their nature. *Dartmouth College vs. Woodward,* 4 *Wheat.,* 700, 701; *Gordon vs. Appeal Tax Court,* 3 *Howard,* 150; *Van Allen vs. Assessors,* 3 *Wallace,* 584; *Delaware Railroad Tax Case,* 18 *Wallace,* 229; *Farrington vs. Tennessee,* 95 *U. S.,* 686, 687, 691; *Cesena Sulphur Co. vs. Nicholson, L. R.,* 1 *Exc. Div.,* 451.

The exemption of the shares of stock of a corporation from taxation does not, of itself, exempt the property of such corporation from taxation; nor does the exemption of the property of a corporation from taxation, of itself, exempt the shares of stock of such corporation from taxation. *Farrington vs. Tennessee,* 95 *U. S.,* 686, 687, 691.

It does not clearly appear from the charter of the appellee that the Legislature intended to do more than exempt its shares of stock from taxation. The franchises and property of the corporation, not being exempted from taxation in clear and unambiguous terms, ought, there-

fore, to be held to remain within the taxing power of the State. *Mayor, etc. vs. B. & O. R. R. Co.*, 6 *Gill*, 292; *Providence Bank vs. Billings*, 4 *Pet.*, 561; *Phila. & Wilm. R. R. Co. vs. Md.*, 10 *Howard*, 393; *Soc. of Savings vs. Coite*, 6 *Wall.*, 606; *North Missouri R. R. vs. Maguire*, 20 *Wall.*, 61; *Erie R. R. Co. vs. Penn.*, 21 *Wall.*, 498; *Cooley on Taxation*, 54.

The Act of 1872, ch. 234, imposed a tax upon the franchises of railroad companies, measured by their gross receipts. *State Tax on Railway Gross Receipts*, 15 *Wall.*, 294; *State vs. P. W. & B. R. R. Co.*, 45 *Md.*, 379. As the franchises of the appellee are not clearly exempted from taxation by its charter, its gross receipts remain within the taxing power of the State.

If the Court should adhere to the rule laid down in *Mayor, etc. vs. B. & O. R. R. Co.*, 6 *Gill*, 295, 296, the exemption of the property of the appellee from taxation, because of the exemption of its shares of stock from taxation, extends only to the property owned by the appellee on March 6, 1859, the date limited by the Virginia Act of March 6, 1847, for the completion of the railroad of the appellee to the Ohio River. The immunity was intended to extend only to the work, which the Company contracted to complete before the day named. It was not intended to extend to additions subsequently made by the appellee to the work thus completed.

The exemption of the property of the appellee from taxation, even if the rule laid down in 6 *Gill*, 295, 296, be adhered to, cannot certainly extend to franchises or property not held or acquired for the purpose of completing the railroad of the appellee from Baltimore to the Ohio River.

It does not extend to the special stock issued by the appellee for the construction of its Washington Branch Railroad, under the Acts of 1830, ch. 158, and 1832, ch. 175. This special stock is exempted temporarily only

from taxation under the Acts of 1872, ch. 234, and 1874, ch. 408.

The immunity does not extend to any stock, or bonds, which the appellee acquired in the exercise of the power given to it, by the Acts of 1836, ch. 276, or 1870, ch. 476, to aid in the construction, by other companies, of railroads lateral to, or in continuation of its limited line. Such stocks and bonds have their *situs* in this State, because the appellee is a Maryland corporation only, *Railroad vs. Harris,* 12 *Wall.,* 81, and are taxable in this State, because the appellee, their owner, is such Maryland corporation. *Van Allen vs. Assessors,* 3 *Wall.,* 584; 1 *Redfield Am. Railway Cases, Supp.* 503, 504; *State vs. Branin,* 3 *Zab.,* 507; *State vs. Bentley,* 3 *Zab.,* 341; *Newark City Bank vs. Assessors,* 30 *N. J.,* 20; *Cooley on Taxation,* 15, 16, 274; *State Tax on Foreign Held Bonds,* 15 *Wall.,* 319.

The exemption does not extend to the Metropolitan Branch Railroad, constructed under the Act of 1866, ch. 154. It does not extend to the Rolling Mill at Cumberland, acquired under the Act of 1868, ch. 119. *Inhabitants of Worcester vs. Western R. R. Co.,* 4 *Metc.,* 568, 569; nor to any interest in steamships, acquired under the Act of 1868, ch. 471, sec. 218. *Colman vs. Eastern Counties Railway,* 4 *Eng. Railway and Canal Cases,* 390–393.

The exemption does not extend to the preferred stock, created by the appellee under the Act of 1868, ch. 471, sec. 219; nor to the hotels at Cumberland, Oakland and Deer Park; *Milwaukee and St. Paul R. R. Co. vs. Supervisors,* 29 *Wisc.,* 120–125; nor to the elevators of the appellee.

These elevators are not warehouses, in the sense in which that word is used in the 14th section of the Act of 1826, ch. 123. They are not intended for the receipt and delivery to a consignee of specific grain, shipped to him, but for the general storage of grain, intended to be sold

by certificates of quantity and quality. Their management is a business separate from the business of a common carrier.

The piers and wharves of the appellee could not have been acquired by condemnation under its original charter; and not being within the descriptions of property authorized to be acquired under that charter, are subject to taxation. *State vs. Parker*, 33 *N. J. Law*, 316.

Warehouses, belonging to the appellee, not exclusively used for the storage of goods arriving by, or intended for, shipment on its railroad, are subject to taxation by this State. *State vs. Newark*, 1 *Dutcher*, *N. J* , 315.

No building, or machinery, owned by the appellee, which is not necessary to the exercise by the appellee of franchises granted by its original charter, is exempted from taxation. *Railroad vs. Berks County*, 6 *Penn.*, 71; *Milwaukee, etc. R. R. Co. vs. Milwaukee*, 34 *Wis.*, 285; *Lances' Appeal*, 55 *Penn.*, 25, 26; *N. Y. & H. R. R. R. Co. vs. Kip*, 46 *N. Y.*, 552.

As the appellee is a Maryland corporation only, all the money received into its Maryland Treasury, wherever earned, is incorporated in the general mass of its receipts, as a Maryland corporation, and is taxable in this State. 15 *Wall.*, 294, 296.

*John K. Cowen* and *I. Nevett Steele*, for the appellee.

First.—The Acts of 1872, ch. 234, and 1874, ch. 408, taxed only such receipts as were derived from the transportation of freight and passengers *within the State of Maryland*.

These Acts are *in pari materia*. Comparing the two Acts, they are identical with the addition of section 157 to the last, which was added to enable the Comptroller, where a road extended beyond the borders of Maryland, to approximate to the gross receipts within the State, when he was not furnished with a statement of them by the company's officers.

The phraseology of the first Act is, of itself, sufficient to show that the Legislature meant the gross receipts *within the State* only. The title of the Act indicates it,—and the first section purports to levy the tax upon the gross receipts of railroad companies worked by steam, incorporated by, or under the authority of the State, *and doing business therein.*

To subject the gross receipts to taxation, the company must not only be a railroad *in* the State, but it must be *doing business* in it.

Had it not been intended to limit the gross receipts to be taxed, to the earnings from the *business done in the State,* there would have been no reason for section 157, in the Act of 1874, to introduce which, it was necessary to conform to the requirements of section 29, Article 3, of the Constitution, in regard to the mode of enacting laws.

Apart from these considerations however, the Acts of 1872, and 1874, have received a judicial construction from this Court in the case of *The State vs. The Philadelphia, Wilmington and Baltimore Railroad Company,* 45 *Md.,* 451. The road between Philadelphia and Baltimore was composed of separate links originally, now consolidated; one of which was between Baltimore and the Susqnehanna River, and did not enjoy the exemption from taxation that is claimed here under the 18th section of the appellee's charter.

" The only remaining point then to be considered," say the Court in delivering its opinion, " is the apportionment of the gross receipts liable to taxation under the Act of 1872 and 1874; and in regard to this, we are of opinion that upon the pleadings and admitted facts in this case, the State is entitled to recover a sum equivalent to that part of the gross receipts, which may be in the same proportion to the whole amount of gross receipts of the defendant on its entire.,road from Baltimore to Philadelphia, that the number of miles of the Baltimore aad Port

Deposit Company bears to the whole number of miles of the Philadelphia, Wilmington and Baltimore Company, of which it forms a part. It is true the gross receipts on one part of the road may be greater than on another, but perfect equality in the assessment and apportionment of taxes is unattainable, and the rule we have adopted seems fair and reasonable."

The appellant claims the tax of one-half of one per cent. upon the income of bonds or stocks held by the appellee. The only income from this source is derived from bonds of the Ohio and Mississippi Railroad Company and the South Carolina Railroad Company, and from the stock of the North German Lloyd Steamship Company.

This income is not taxed by the Act of 1872, if we are right in our view, that the Act applies only to earnings of the company as a railroad, by the exercise of its franchise. Such, we understand to be its construction as adopted by this Court in the case in 45 *Md.*, 451. If it should be held to extend to these items of income, it would violate the Bill of Rights, by adopting one mode of taxing bonds and stocks when held by railroad companies, while another mode of taxing the same securities was adopted when they were in the hands of individual holders. *The State vs. C. & P. R. R. Co.*, 40 *Md*, 51; *Tyson vs. The State*, 28 *Md.*, 577.

These *items of income*, if the Court holds that the Act of 1872 applies to them, are covered by the exemption of the 18th section of the charter.

It is contended for the State that certain "means in the aggregate," constituted the earning power of the appellee, and that if a "particular means, forming part of 'this' aggregate was subject to taxation, its proportion of earnings might be subject to taxation," &c. "This theory of the case underlies the whole argument" on the part of the State. These terms, "means in the aggregate," are used as representing "the total value of the franchises, capital stock and property of the appellee."

The obvious general reply to this view is, that the franchises, capital stock and property of the appellee are all exempt from taxation under its charter, as settled by well considered and repeated decisions of this Court. The legislative construction of the language of the charter, was to the same effect as far back as 1831, and that language upon examination of it now is not reasonably susceptible of any other construction. Upon the faith of these legislative and judicial declarations of the meaning of the charter, thousands of shares of the stock have been purchased. The doctrine is now firmly settled that a change of judicial decisions in the State Courts, as to the meaning of State statutes and State Constitutions cannot be permitted to impair the obligation of contracts.

Stockholders have invested their money, and this appellee has expended its means upon the faith of the former decisions of this Court, as to the extent and validity of the charter exemption—therefore, by the well settled doctrine, these decisions must now stand as the settled law. *Ohio Ins. & Trust Co.. vs. De Bolt,* 16 *Howard,* 416, 428, 429; *Gelpcke vs. Dubuque,* 1 *Wall.,* 175–206; *Havemyer vs. Iowa City,* 3 *Wall.,* 294, 302–3; *Olcott vs. Supervisors,* 16 *Wall.,* 678–690.

Second.—The exemption from taxation under the 18th section of the charter of the appellee, extends to and covers *all* the property of the appellee.

The shares of its stock embrace and represent its franchises and all its property, and the shareholders are the beneficial owners of the whole in the language of this Court, in the case of the *Insurance Company vs. The State,* 23 *Md.,* 311. "The position," say the Court, "that the corporation as an entity, and not the shareholders, is the owner of its capital stock, seems to us more ingenious than sound, at least so far as it affects the question before us." *The Tax Cases in* 12 *G. & J.,* 117, decide that the stock of a corporation is the representative of its whole property.

The case of *Gordon's Ex'r vs. Mayor, &c. of Balt.*, 5 *Gill*, 236, decided that "the stock of a bank is the representative of its whole property ; and when a tax has been laid on the stock in the hands of shareholders, the real and personal estate of the company became exempt from taxation." See *Mayor, &c. of Baltimore vs. Balt. & Ohio R. R. Co.*, 6 *Gill*, 295–296 ; *Phila., Wilm. & Baltimore R. R. Co. vs. Bayless*, 2 *Gill*, 355 ; *Gordon vs. The Appeal Tax Court*, 3 *How.*, 147 ; *Lionberger vs. Rouse*, 9 *Wall.*, 477 ; *Wilmington R. R. Co. vs. Reid*, 13 *Wall.*, 264.

In a late case in Connecticut the doctrine is distinctly affirmed, that the "exemption of the stock and income" of a corporation from taxation, is an exemption of the property and franchises of the company, as well as an exemption of the shares of stock in the hands of the individual holders. *Nichols vs. New Haven and Northhampton Co.*, 42 *Conn.*, 123 *and* 125 ; *New Haven vs. City Bank*, 31 *Conn.*, 106 ; see also—*State vs. Hood*, 15 *Richardson*, *(Law,)* 177, 188, 189, 191 ; *State vs. City Council of Charleston*, 5 *Richardson*, *(Law,)* 561 ; *Atlantic and Gulf R. R. Co. vs. Allen*, 15 *Florida*, 660 ; *Bank vs. City Council*, 3 *Richd.*, *(Law,)* 342, 344 ; *Rome R. R. Co. vs. The Mayor and City Council of Rome*, 14 *Geo.*, 275 ; *The State Bank vs. Brackenridge*, 7 *Blackford*, 395, 397 ; *The State vs. Berry, et al.*, 2 *Harrison*, *(N. J.,)* 80 ; *Bank Tax Cases*, 2 *Wall.*, 200, 208, 209 ; *Bank of Commerce vs. New York City*, 2 *Black*, 620 ; *City of Richmond vs. Richmond & D. R. R. Co.*, 21 *Gratt.*, 604 ; *State, Cape May & M. R. R. Co. vs. Collector*, 38 *N. J.*, 270.

Third.—The exemption from taxation and the franchises claimed by the appellee continue unimpaired up to the present time.

The appellant contended in his brief that "when the railroad of the appellee was completed to the Ohio River, according to the plan indicated in the Act of 1826, ch. 123, and the time for completing said road prescribed by

law had expired, its right of eminent domain and all its powers of condemnation ceased," and, again, "when the railroad was completed to the Ohio River in 1859, its powers of condemnation were exhausted."

And in support of this doctrine, besides the authorities cited by it, the appellant relied upon the Act of 1836, ch. 82, authorizing the re-location of its line between Baltimore and the Monocacy River, and the Act of 1866, ch. 154, authorizing a change in the location of portions of its line, in order to obviate difficulties arising from existing locations ; and the inference drawn by the appellant, was that only such capital stock as existed in 1859 was exempted from taxation ; and that no property could upon any proper theory be considered as exempted from taxation, except the property which was obtained with the proceeds of the stock existing in 1859.

When the Acts of 1836, ch. 82, and 1866, ch. 154, were passed, the road had already been constructed ;. and so far as regarded the particular section of the road whose location was changed, the power of condemnation it was thought might be held to have been exhausted. So it was supposed to have been, when the local canals were made on the Potomac ; but yet this Court held that the power of condemnation on the long intervals between them, still continued in force.

Even if it were admitted, then, that having once exercised the right to condemn a route and build a road on it at a particular place, the power to condemn an improved location, depended upon an additional grant, still, this would not affect the general right of condemnation for all matters connected with the use of the road, such as increasing its water stations, warehouses and appurtenances generally.

As to the power of condemnation after a road is completed and in operation, see *Chicago, B. & Q. R. R. vs. Wilson,* 17 *Illinois,* 133 ; *Toledo, Wabash and Western R.*

*R. Co. vs. Daniels,* 16 *Ohio State,* 390–398 ; *P. W. & B. R. R. Co. vs. Williams,* 54 *Penn.,* 107.

As to continuance of chartered powers, see *Hamilton vs. R. R. Co.,* 1 *Md. Ch. Dec.,* 107 ; *Taggart vs. Western Md. R. R. Co.,* 24 *Md.,* 563.

Fourth.—The exemption of the 18th section embraces whatever is employed in, or is made subservient to, the proper business for which the company was formed.

Under this head, fall the objections of the appellant to the immunity from taxation claimed for the warehouses, wharves, piers, hotels and elevators ; and in arguing the point, it must not be understood that the appellee abandons the ground that any misuse of authority here, can only be taken advantage of by a judicial inquiry expressly directed to the point. *Mackall vs. Chesapeake and Ohio Canal Co.,* 94 *U S. Rep.,* 308.

In the case of the *Mayor, &c. of Balto. vs. The B. & O. R. R. Co.,* 21 *Md.,* 91, the Court say :

"It must be borne in mind, that we are not dealing with an ordinary private corporation, created only for the pecuniary benefit of its stockholders. The powers granted to the appellee are of the most extensive and comprehensive kind, involving in their exercise great public interests, to promote which was the chief object of its charter. Looking to the great and important objects which the Legislature designed to accomplish by the charter of the Baltimore and Ohio R. R. Co., the Court of Appeals, in 6 *Gill,* 297, has declared the rules by which the charter ought to be construed."

" After stating that the Legislature regarded the completion of the work as ' a great State object,'' the Court say, '' In expounding, therefore, those provisions of the charter of the company, by which its expressed privileges and exemptions are imparted, liberal rules of interpretation for its benefit ought to be adopted to effectuate the benevolent designs of the Legislature, and not such rules of con-

·struction and limitation as should be applied to the charters of companies incorporated for the peculiar benefit of their stockholders.''

It is in the interest of the public, then, as well as for the benefit of the stockholders, that the question of *the completion* of the road is to be considered. The interest of the public is to have the most perfect work which the knowledge and skill of the day can furnish—in other words, a complete work. And while any part of the company's road, with its equipment and appliances falls short of this, to that extent is the public justified in saying that the condition upon which the charter was granted has not been complied with.

In 1859, there was but one track to the Ohio—with an inferior rail and with meagre appliances as we know *now*, whatever the President and Directors may have been justified in saying *then, when* it may be alleged they knew no better; but it will not be pretended that the public which has the interest described by the Court of Appeals, would not rightfully complain were the road in all its appliances no better *now* than it was *then*. See *Canal Company vs. Railroad Company*, 4 *G. & J.*, 1 ; *Bruce vs. Pres't, &c. of Delaware and Hudson Canal*, 19 *Barb.*, 371 ; *Selden vs. Delaware and Hudson*, 29 *N. Y.*, 634.

The constructions referred to by the State are those which are justified by the current of authorities in this regard, as a part of the work authorized by the charter. *N. Y. and Harlem R. R. Co. vs. Kip*, 46 *N. Y.*, 546 ; *Inhab. of Worcester vs. R. R. Co.*, 4 *Metcalf*, 568 ; *Madi-. son Plank Road Co. vs. Waterton*, 5 *Wisconsin*, 172 ; *Lyde vs. Eastern Bengal R. R. Co.*, 36 *Bevan*, 10-16 ; *State vs. Hancock*, 35 *New Jersey*, 537 ; *State of South Carolina vs. Hood*, 15 *Richardson*, 177.

In the case of *Osborn vs. New York and New Haven R. R. Co.*, 40 *Conn.*, 498, the Court ruled as to the necessity of wharves or docks to carry on the business of a railroad

company. *State, Morris & Essex R. R. Co. vs. Haight,* 35 *N. J.,* 40 ; *S. Wales Ry. Co. vs. Redmonds,* 10 *C. B. N. S.,* 683, 685, 687.

In the case of *New Haven vs. City Bank,* 31 *Conn.,* 106, a building erected for corporate purposes was sub-let, in part, for other objects, which it was held, did not deprive it of its exemption from taxation as the property of the bank. *Warden, &c. vs. S. Eastern R. R. Co.,* 9 *Hare,* 489 ; *Hamilton vs. R. R. Co.,* 1 *Md.,* 553 ; *State vs Betts,* 4 *Zabriskie,* 559.

The fact that a warehouse is occasionally used for the deposit of goods that have not been transported over the line, or are not intended for shipment, does not at all change the character of the property.

The doctrine is maintained by the authorities, that a corporation may employ its corporate property, when it would otherwise be lying idle and profitless, for such purposes as are not alien to its primary business. *Green's Brice's Ultra Vires,* 67–71 *and* 74, *and notes; Forrest vs. Man., Shef. & Lin. Rly. Co.,* 30 *Beav.,* 40 ; *Simpson vs. Directors of Westminster Palace Hotel Co.,* 8 *Ho. Lds. Cas.,* 712 ; *In re Horsey vs. London and Colonial Co.,* 37 *Law Jour.,* 392 ; *Brown and others vs. Winnisimmet Co.,* 11 *Allen,* 326 ; *French vs. Inhab. of Quincy,* 3 *Allen,* 9 ; *State vs. Betts,* 4 *Zab.,* 555 ; *New Haven vs. City Bank,* 31 *Conn.,* 106.

This same principle will apply to those hotels which are essential for the needs of the road—but which are used incidentally to entertain guests who may not have been travellers over the road.

The fourteenth section of the appellee's charter, provides in so many words for the erection of warehouses and other works that might be necessary or useful in the construction or repair of said road.

What is an elevator, but a grain warehouse, with the modern improvements required by the demands of trade at the City of Baltimore?

What is a pier or wharf, but a place for the deposit of goods at navigable water?

What was the main purpose of the State in chartering this railroad? It is a matter of history that its design was to bring the Western trade to the port of Baltimore, not simply to supply a local demand, but for the purposes of transhipment as ocean commerce. Can it be that this Company can build a warehouse or freight depot at a country town, but is not permitted by its charter to erect a pier or construct a wharf on navigable water, in order that the products brought from the West and from local points along its line, may be conveniently deposited for the purpose of shipment by vessel; these piers and wharves are but depots on navigable water—and can it be said this company may erect depots along its line inland, but that it has no right to erect a depot, or pier, or wharf on navigable water, when the main purpose of the founders of the enterprise was to bring the rich products of the West to tide-water at Baltimore?

Among the first Ordinances of the City of Baltimore, (Resolution No. 69, April 16th, 1828,) was one granting lands to the company on navigable water, for the purposes of docks and wharves. The language of the charter authorizes the company not only to construct works that are "necessary" for the purposes of the road, but also such as may be "useful" or "expedient."

The proof is that these works are not only "useful" and "expedient" for the purposes of the road, but that they are absolutely essential for its operations.

Fifth.—The exemption embraces not only what was represented by the original subscription, or was acquired up to any given period afterwards, but by proceeds of mortgages, and the issue of preferred stock, and the use of undistributed profits.

It must be borne in mind that the charter fixes no limit to the capital of the company. That it is authorized to

increase the capital stock by the addition of as many shares as the president and directors may deem necessary, for which they may, at their option, cause subscriptions to be received in the manner prescribed by them—or may sell the same for the benefit of the work, for any sum not under the par value. *Act of* 1826, *ch.* 123, *sec.* 13.

That it is authorized to borrow money and to issue certificates, or other evidences of debt, and to pledge the property of the company for the payment of the same and its interest. *Ib.*

All these powers were conferred to enable the appellee to carry out "the purposes of this Act."

Then, what were the purposes? The construction, equipment and working of a complete road—complete, looking to the exigencies of a public demand, which ever exacting, required a continual exercise of the franchises granted by the charter, facilitating the most convenient use of the road, and so complying with the conditions, which alone justified the granting of the franchises of the appellee.

We have endeavored to show that this was the scope of the decision in the case of the canal and the railroad, and that until this was accomplished, the appellee was authorized to issue stock from time to time, to borrow money and to pay interest on loans.

If we are right in the view we have taken, then neither the 28th February, 1844, nor the 1st October, 1859, limited the right of the appellee to create stock—to borrow money, or to execute mortgages—and the argument of the appellant to the contrary fails.

As to freedom from taxation of subsequent issues, see *State vs. Norwich R. R. Co.*, 30 *Conn.*, 290.

So far as there is any question as to the exemption from taxation of property created by using the undistributed profits of the appellee—that would seem to have been settled by the case of the *State vs. B. & O. R. R. Co.*, 6

*Gill,* 363, where it was held that the appellee might as well borrow from its stockholders, by retaining their dividends and using them in construction, giving them certificates of indebtedness, as it could from a stranger; that even if at the time this was done, a purpose to make a stock dividend was not declared, it was sufficient if such was understood to be the policy of the company; and in the case of *People vs. The Commissioner of Taxes,* 4 *Otto,* 416, the Supreme Court say "that the *reserve* fund, reserved from the profits, (or undistributed profits) is as much a part of the property of the bank, and goes to fix the value of the shares equally, as if it were not called by that name, but remained as a part of the specie, bills discounted, or other funds of the bank undistinguishable from the general mass."

This being so, the State has no more right to subject to taxation the undistributed profits of the appellee, or the property created by the use of them, than it has to tax the shares of the company expressly exempted by the 18th section of the charter.

ROBINSON, J., delivered the opinion of the Court.

Section 18 of the Act of 1826, incorporating the Baltimore and Ohio Railroad Company provides:

"That the said road or roads, with all their works, improvements and profits, and all the machinery of transportation used on said road, are hereby vested in the said company, incorporated by this Act and their successors forever; and the shares of the capital stock of the said company shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burthen."

There is no provision either in the Act of incorporation or in the Constitution then in force in this State, reserving the right to repeal or amend the charter of the appellee, and the exemption from taxation therein granted, is a con-

tract between the State and the corporators, within the protection of the Constitution of the United States, and therefore beyond the power of a subsequent Legislature to repeal or in any manner impair. *State vs. Northern Central Railway Co.*, 44 *Md.*, 162; *Miller vs. State*, 15 *Wallace*, 488.

This suit is brought to recover of the appellee a tax imposed by the Act of 1872, ch. 234, on the gross receipts of all railroads incorporated by, and doing business in, this State; and it is claimed that, under the above section, the property and franchises of the company are exempt from the imposition of any tax or burthen. ·

This section has been the subject of judicial construction, and it is necessary therefore in the first place, to understand precisely what has been decided. *In the Mayor and City Council of Baltimore vs. The Balt. and Ohio R. R. Co.*, 6 *Gill*, 292, the power to tax the *real and personal property, and the capital stock of the company, and its shares of stock in the hands of shareholders*, was the question and the sole question, before the Court, and after full argument, all the Judges were of opinion that no such power existed, and that the 18th sec. of the appellee's charter exempted the property and capital stock, and shares of stock, from taxation.

This decision was made in a case in which the Baltimore and Ohio Railroad Company was a party, and upon the very section of its charter, now under consideration. From that time to the present, a period of thirty years, it has been the accepted law of this State; and upon the faith of it millions of dollars have been invested in the property of this company. Every consideration therefore of public policy, and of private right, demands that the decision of the Court upon *the question thus submitted to its adjudication, shall be deemed final and conclusive.*

In delivering the opinion of the Court in that case, Judge DORSEY, however, said, that the exemption of the

shares of stock of the company, exempted also its franchises, because the franchises constituted and formed part of the market value of such shares.

The right to construct a railroad and to charge tolls for the transportation of freight and passengers is a franchise granted by the State, and a tax upon the tolls thus received is therefore a tax on the franchise itself. It would follow therefore, that if the franchises of the appellee are exempt from taxation, the gross receipts derived from the exercise of such franchises are also exempt. It is insisted, however, that the question in regard to the exemption of the appellee's franchises, was not before the Court in 6 *Gill;* and that whatever deference is due to the opinion of so distinguished a Judge, it ought not to control our judgment in a subsequent suit, where the very point is presented for decision.

Conceding this, the question then is, whether the franchises of the appellee are by the 18th sec. of its charter exempted from taxation? This section, it is true, does not in so many words exempt the franchises of the company, but provides that its *shares of stock shall* be exempt from the imposition of any tax or burden. And it is contended that the shares of stock, and the property and franchises of a railroad company are separate and distinct properties, with separate and distinct ownerships, and that the exemption of the one, does not therefore exempt the other. The question, however, is not whether shares of stock abstractly considered, embrace and represent the property and franchises of the appellee. Strictly speaking it may be true, that a shareholder is not the legal owner of any portion of the property of the company, and his shares of stock are evidences only of his right to participate in the business and government of the corporation, and to a proportional share of the profits earned by the company. We are not dealing, however, with abstract definitions, but with an Act incorporating a railroad com-

pany, and endeavoring to ascertain how far, and to what extent, the Legislature meant to exempt the corporation from taxation. We are not bound therefore by the literal meaning of the words of the statute, but must look to the connection in which they are used, the subject-matter to which they are applied, and the motives and objects which actuated the Legislature in conferring this privilege on the appellee.

It is a sound rule of construction we admit, that the power of taxation is never presumed to be relinquished, unless the intent to relinquish is clearly expressed. In view however of the fact that the construction of this road "was considered by the people of the State and by the Legislature as a great State object, tending to develop the wealth and to promote the prosperity of the whole State and particularly of the City of Baltimore," this Court has said, "that liberal rules of interpretation ought to govern in the construction of the privileges and exemptions conferred on the company, and not such rules of restriction and limitation as are applicable to the charters of companies incorporated for the peculiar benefit of shareholders." We must bear in mind that the appellee was incorporated in 1826, and was in fact, the first railroad ever chartered in this country for the transportation of freight and passengers. It was to extend from Baltimore to the Ohio River, a distance of 379 miles, involving necessarily in its construction an enormous sum of money, and was therefore justly considered not only as a gigantic, but in a pecuniary sense a hazardous enterprise. Under these circumstances, the Legislature was willing to confer on it "every privilege and immunity which could reasonably be required and which would tend to the completion of the road." Such then being the motives of the Legislature, let us look to the clause in the appellee's charter under which this exemption is claimed. And here we find it provides that "the said road or roads with all their works,

improvements and profits, and all the machinery of trans-
portation shall be vested in the said company incorporated
by this Act," "and the shares of the capital stock of the
said company * * * * shall be exempt from the
imposition of any tax or burthen." The section thus
declares in the first place *that all the property and profits*
of the company shall be vested in the corporation, and
secondly, that the *shares of stock shall be exempted from
taxation.* As used in this connection, we understand the
Legislature to mean that the *shares of stock*, representing
the *property and profits of the company*, shall be exempt
from the imposition of any tax or burthen. The Legis-
lature beyond all question, intended to confer a sub-
stantial benefit on the company, and thereby to induce
capitalists and others, to invest their means in the con-
struction of a road, which every one deemed of so much
importance to the State. And to say they meant to exempt
the *shares* only, and to reserve the right to tax the
*property* and *franchises,* is a construction that would
render the privilege thus granted of no practical benefit
to the appellee. So considering the question as one of
first impression, we are of opinion that the 18th section
exempts the property and franchises of the company from
taxation. If the franchises are exempt, it would necessarily
follow, that the gross receipts derived from the exercise of
its franchises, are also exempt.

But conceding this construction, we are pressed with
the argument that inasmuch as the appellee was required
to complete its road to the Ohio river in the year 1859,
and having completed *one track* by that time, the *entire
road* is to be considered as completed and equipped at that
time, within the meaning of its charter, and that the
immunity from taxation thus granted to the appellee is
to be limited to the exercise of its franchises necessary to
operate this one track, and to the property owned by the
company at that time. Now the object of this provision

was to enable the State to institute proceedings for the forfeiture of the charter, provided the road was not constructed within the time thus prescribed. But it was a provision the State could waive at pleasure, and until forfeiture, the franchises remained unimpaired.

There is nothing either in the spirit or letter of the charter to justify the narrow construction contended for by the State, namely that by the completion of one track this road is to be considered fully completed and equipped within the meaning of the Act of 1826. On the contrary the appellee was authorized to construct a road not exceeding sixty-six feet in width, with as many tracks as might be deemed necessary; to build lateral roads in any direction, and to erect warehouses and other works *necessary and expedient* for the completion and operation of the road. To this end, full power was conferred on the President and Directors to increase the capital stock to any amount they might deem necessary; to issue certificates of indebtedness, and to pledge the property of the road for the payment of the same, and also to use the undistributed profits of the Company.

Now it may be true that neither the Legislature nor the most sanguine promoters of this enterprise realized the great success which this road has achieved. But it is clear they did look forward to it as one of the great routes to and from the West to the seaboard, not merely with one track and with the machinery necessary to operate it, but with as many tracks as could be constructed within the sixty-six feet bed of the road, fully equipped in every respect with machinery and works of every kind necessary to meet the demands not only of the then existing, but what was deemed of much greater importance, the ever increasing trade of that section.

The construction then of such additional tracks and the purchase of machinery, and the erection of buildings and works incident to and necessary to the business of the

road, required the continual exercise of the franchises thus granted to the company.

We are of opinion therefore, that the gross receipts of the appellee's entire road from Baltimore to the Ohio River, and the gross receipts derived from the lateral roads built by the appellee, and from all buildings and works necessary and expedient to the operation of its road are exempt from the imposition of any tax or burthen. And this too, whether said road or roads, and buildings, and works were constructed with money derived from the subscription to its capital stock, or from sales of its shares of stock, or from money borrowed, and secured by mortgage, or from the undistributed profits of the company, or from all these sources combined.

And this brings us to the question, what are the buildings and works necessary and expedient to the operation of the road within the meaning of the appellee's charter? And here we are met with the argument that "*necessary*" means buildings and works indispensable to the road. This, however, is not a mere dictionary question, but one involving the construction of a power granted to a railroad company to enable it to accomplish the objects for which it was chartered. And as used in this connection, it is clear the Legislature meant such buildings and works as were reasonably convenient and appropriate to the maintenance and operation of the road. Construed in this sense, the question is whether "*necessary*" buildings embraces the *elevators, wharves, piers and docks* owned by the appellee? Now one of the main objects in chartering this company was to bring the Western trade to the port of Baltimore, not merely to supply a local demand, but for the purposes of transhipment as ocean commerce. These buildings and structures are therefore necessary for the business of the appellee as a common carrier, for the purposes of receiving and storing grain and freight shipped over its road after the same have reached the

place of destination, and previous to delivery to the consignee or owner. But the rights of the appellee in this respect are such as pertain to its functions as a common carrier; and as such, it has no right to own and use these structures for the storage of grain and freight *after the owner or consignee has had a* reasonable time to remove the same. The Act of 1826 does not certainly authorize the appellee to carry on the general and ordinary business of a warehouseman, and however closely such business may be connected with that of a carrier, it is in no sense necessary to the exercise of the rights and privileges granted to the appellee as a railroad company. If the Act of 1830, ch. 117, or any subsequent Act, does authorize the appellee to carry on such business, that is to receive and charge for the storage of grain and other freight generally, then it is clear that the gross receipts derived from the exercise of this special privilege or franchise are liable to the tax imposed by the Act of 1872. On the other hand if no such power has been conferred, and these structures are owned and used by the appellee for the purpose of carrying on a business separate and distinct from its business and obligations as a carrier, then such structures are taxable according to valuation as other real property.

It is hardly necessary to say that the original charter does not authorize the appellee to build and conduct hotels in the usual and ordinary manner in which hotels are kept, that is for the accommodation of the public generally. But we are not dealing with the charter of a mere local railroad, but one authorizing the construction of a road from Baltimore to the Ohio River, designed and now used as one of the great through routes to the West. Hotels then, or buildings for the accommodation of passengers over the road, are, we think, necessary to its business and therefore within its charter. The record shows that the Cumberland and Viaduct Hotels were mainly designed

and are now used for this purpose; and in addition thereto for ticket and telegraph offices, and waiting rooms for passengers. The gross receipts derived from these hotels are therefore exempt from taxation. The Oakland and Deer Park Hotels however, appear to have been built and are now used primarily as places of summer resort, and although as such they may attract travel over the road, they are not in any sense necessary to its operation. But the receipts from these hotels are not liable to the tax imposed by the Act of 1872, because they are not derived from the exercise of any franchise granted by the State, and they must be taxed according to valuation as other real property.

We come now to the receipts derived by the appellee from properties held and owned, not in pursuance of any power conferred by its *original charter*, but under subsequent grants from the Legislature, and upon which no exemption was engrafted. The Act of 1836, ch. 276, authorized the appellee to subscribe towards the construction of any lateral or connecting road, and to acquire an interest therein not exceeding two-fifths of the estimated cost of constructing such road. This is a distinct privilege or franchise granted to the company, and the gross receipts derived from the interest thus acquired in such lateral or connecting road, are liable to the tax levied by the Act of 1872.

The gross receipts of the Metropolitan Road are also, we think, liable to this tax. The original charter it is true, authorized the appellee to build lateral roads, and this power is not limited to the construction of roads leading to *lime-kilns, factories and distilleries*, as was urged in argument by the Attorney General, but authorizes the appellee to build such roads for the transportation of freight and passengers. The Metropolitan Road was not built, however, under this provision in the original charter, but under the Act of 1865, ch. 70, which authorized the appellee to con-

struct a road between Knoxville and the Monocacy Junction to the boundary of the District of Columbia; and for the purpose as the Act expressly declares, for providing a more direct communication from the West and North-West with the City of Washington. At this latter place it forms a junction with the Washington Branch, thus making a route distinct from, and independent of, the main line of the appellee. In no just sense can this road be considered as a lateral road within the meaning of the original charter. The Act of 1865, does not exempt the projected road or its franchises from taxation. No separate account however has been kept of the receipts derived from this road, but it appears they were commingled with the receipts of the Main stem. Under such circumstances the only rule by which we can approximate to such receipts, is to say that they shall bear the same proportion to the entire gross receipts derived from the Main stem in the State, as the number of miles of the Metropolitan Road bears to the entire length of the appellee's road.

It is equally clear, the Act of 1826 confers no power on the appellee, to acquire or hold any interest in Steamship or Steamboat lines. This power is granted by the Act of 1868, ch. 471, sec. 218, and being a separate and distinct franchise, the receipts or dividends derived from the interest acquired in such Steamship or Steamboat lines, by virtue of the special franchise thus conferred, are liable to the gross receipt tax.

It does not satisfactorily appear from the record, how, or in what manner the appellee acquired the bonds of the South Carolina and the Ohio and Mississippi Railroad Companies. The charter certainly confers no such power, and if they were acquired under any subsequent grant from the Legislature, then the interest received on such bonds would be liable to the tax imposed by the Act of 1872. On the other hand if they were held outside of the appellee's franchises, then such bonds would be liable to

taxation as other bonds, that is, according to their market value.

Without extending this opinion by a review of the several properties owned by the appellee, it is sufficient to say that the gross receipts derived from all properties and investments held and owned under franchises granted, subsequent to the Act of 1826, incorporating the Baltimore and Ohio Railroad Company, and upon which no exemption from taxation was engrafted, are liable to the tax levied by the Act of 1872.

And this brings us to the question, whether this Act imposes a tax on the entire gross receipts of the appellee, or only on such as are earned by the road within the State. And in determining this question, we must bear in mind that this tax is levied on railroad companies in consideration of special rights and privileges granted to such companies; these privileges, however, confer no power to maintain and operate a road beyond the limits of the State, and in the absence of language showing a contrary intention, it would be but fair to presume the Legislature meant to tax such receipts only, as are earned by the franchises thus granted. Now the Act of 1872, merely imposes a tax on all railroads incorporated and doing business in the State, and if the question rested solely upon the construction of this Act, it would be questionable, to say the least, whether the Legislature intended to tax receipts earned by the exercise of franchises granted by other States. But when this Act is construed in connection with the Act of 1874, ch. 408, it is clear, we think, that the tax is imposed only on such gross receipts as are earned in the State.

Such are the conclusions we have reached in this case. Upon an examination of the several prayers offered by the State, we find that none of them present propositions of law in accordance with the views we have expressed, and there was no error therefore in rejecting them. It is plain, however, that the State was entitled to recover in this suit, and

even were we obliged to affirm the judgment below, we should have remanded the case for a new trial under sec. 16, Art. 5, of the Code.

The Court erred, however, in sustaining the defendant's exceptions to the plaintiff's third and fourth interrogatories. The Act of 1872 imposes a tax not only on the gross receipts derived from freight and passengers, but on the receipts derived from all other sources, provided such receipts were derived from properties and investments owned by the appellee under franchises granted by the State, and upon which no exemption from taxation was granted.

*Judgment reversed, and*
*new trial awarded.*

(Decided 21st February, 1878.)

ALVEY, J., filed the following opinion concurring in part, and dissenting in part:

I agree with the majority of the Court as to the nature and extent of the exemptions secured to the corporation, by its charter; and further, that there is a certain portion of the company's property that is not embraced by the exemption, and is, therefore, liable to taxation.

But, in my view of the subject, no recovery can be had in this action; and consequently I am of opinion that the judgment of the Court below ought to be affirmed.

1. In the first place, I do not agree, as held by the majority of this Court, that the Act of 1872, ch. 234, under which the action is brought, imposes the tax on the franchises of the corporation, measured by the extent of its business; but, in my opinion, the tax on the gross receipts of the company is a property tax, imposed, by the express terms of the statute, upon the particular fund, without mention of or reference to the franchises of the company. Indeed, the State does not sue as for a tax on franchises;

but in its declaration alleges the tax to have accrued and become due on and from the gross receipts of the company. And if I am right in my construction of the statute, it is too clear for question, that the tax sought to be recovered is in flagrant violation of the 15th Article of the Bill of Rights of this State, which requires all taxes imposed upon property, whether real or personal, to be equal and uniform throughout the State;—a thing not pretended in regard to this tax, when compared with the rate of taxation imposed on other personal property of the State. And that I am right in construing this tax to be imposed directly upon the gross receipts, as part of the personal property of the company, and not upon its franchises, I may refer to the cases of *Bank of Commerce vs. New York City*, 2 *Black*, 620; *Bank Tax Case*, 2 *Wall.*, 200; *Nichols vs. New Haven & Northampton Co.*, 42 *Conn. Rep.*, 103, 119.

2. But, in the second place, if it were conceded that, by fair construction, the statute imposes the tax on the franchises, and not directly on the gross receipts, the law would still be obnoxious to the 15th Article of the Bill of Rights; because franchises are property, and, as such, equally entitled to the protection against excessive or arbitrary taxation, under the Bill of Rights, as any other property owned by the corporation. Upon the same principle that the franchises are within the exemption given the property of the corporation, or the shares of its capital stock, though not specifically mentioned as part of the corporate property, are such franchises property within the protection of the Bill of Rights against unequal or excessive taxation. And this has been so declared by this Court, in the case of *The Mayor & City Council vs. The Balto. & Ohio R. R. Co.*, 6 *Gill*, 288. As to the nature of the property in a corporate franchise, see the cases of *The West-River Bridge Co. vs. Dix*, 6 *How.*, 534, *and Wilmington R. R. Co. vs. Reid*, 13 *Wall.*, 264. I am

therefore of opinion that whatever property owned by the corporation that may be subject to taxation, should be assessed and rated as other property in the State, and not by a different rule.   If the restriction imposed by the Bill of Rights be of any value as a safeguard to the citizens of the State, there can be no good or substantial reason why those citizens who may have invested and imperiled their property in corporate enterprises should be denied the benefit of that protection.   In my opinion, there is no limitation in the Constitution of the State more salutary than that upon arbitrary taxation, and I think it should be preserved and adhered to in its integrity.

STEWART, J., filed the following dissenting opinion:

From the view I take of the questions involved in this case, it is not of much practical importance to inquire as to the extent of the immunity from taxation, granted to the holders of the shares of the capital stock in the Balto. & O. R. R. Co., by the provisions of the 18th section of the Act of 1826, ch. 123, which created the corporation.

From the peculiar terms employed in that section, vesting the property consisting of "the road or roads with all their works, improvements and profits, and all the machinery of transportation used on said road," *in the said company and their successors forever;* and making the *shares of the capital stock personal estate;* according to the strict principles of construction, now recognized as applicable to immunity from taxation; there is great force in the argument of the Attorney General in maintaining that the 18th section does not warrant the extension of the exemption, beyond the shares of the capital stock, to the company or its property.

The stockholders have not the ownership of the property or franchises of the corporation; on the contrary, the

property, including the franchises, is vested in and belongs to the company, the artificial person created by the grant, and required to perform all the duties incumbent upon it.

The stockholders can only assert their rights to any dividends accruing from the employment of the property of the company and its franchises. *Gordon vs. Appeal Tax Court,* 3 *Howard,* 150; *Van Allen vs. Assessors,* 3 *Wall.,* 584; *Delaware R. Tax Case,* 18 *Wall.,* 229–234; *Wilmington R. R. Co. vs. Reid,* 13 *Wall.,* 264; 20 *Wallace,* 36.

The legal title to the property being in the company as trustee, the stockholders being the *cestuis que trust,* both in a qualified sense, their only remedy for the refusal of the company to pay such dividends or to compel the proper discharge of the trust, is by resort to the Courts.

It was competent for the Legislature to have granted to the company, *per se,* as an artificial person and to vest in it as such, all the property, real, personal or mixed—this has been done in apt language; and to have distinguished the interest of the shareholders being natural persons, and to have declared that to be *personal estate*—that has been done; and to have conferred *upon it immunity from taxation*—this has been expressly granted; and to withhold such immunity from the company or its property. *Gordon vs. Appeal Tax Court,* 3 *Howard,* 150.

The Legislature had also the power in the grant of the charter, to define the quality as well as the quantity of the property to be held by the company and the interest of the shareholders, and to make it real, personal or mixed property. 13 *Wall.,* 264; 18 *Wall.,* 229–234; 20 *Wall.,* 38.

It is not the province of the Courts to determine what is property, or of what it shall consist, or with what faculties endowed, or what characteristics shall constitute the identity of any distinct species, real, personal or mixed.

That is not a judicial but a legislative function.

The Legislature in designating the stock as *personal estate,* intended it as such to be treated; but it does not hence follow, that it designed to make the property of the company, in its entirety, personal estate; on the contrary, the terms employed show that the Legislature intended no such thing, but just the reverse; to leave the property of the company unconverted, and to remain just as it was, real, personal or mixed. See *Mayor & C. C. of Balto. vs. B. & O. R. R. Co.,* 6 *Gill,* 292; *Prov. Bank vs. Billings,* 4 *Peters,* 561; *Phila. & Wil. R. R. Co. vs. Maryland,* 10 *Howard,* 393; *Erie R. R. Co. vs. Penn.,* 21 *Wallace,* 498.

There is no doubt of the power of the Legislature to have imposed taxes upon either, or both, or to have exempted one or both, or whilst exempting the one, to leave the other subject to the power of taxation. See *Emory vs. State,* 41 *Md.,* 38, and authorities before referred to.

If it had been the intention to exempt the company, a few words would have been sufficient, and there could have been no question upon the subject.

The 15th Art. of the Bill of Rights has provided by its mandate, for the imposition of taxes upon persons holding property, if such resort were necessary.

That Article further cautiously and carefully provides, that such mandate is not to be considered as a denial of the right of the State to impose other taxes, deemed necessary, *upon grounds of public policy.* The one clause is as mandatory as the other; the integrity of the declaration cannot be severed; both provisions, (or one with the qualification of the other,) must be considered to give proper meaning and effect to it.

To take the first clause and ignore the latter, contravenes the intention.

Fully aware of the purport of this great principle of taxation, the Legislature may have intended by the terms

employed to exempt the shares of stock, but not the property of the company upon principles of public policy.

To the Legislature, this sovereign right of taxation or exemption is entrusted, to be exercised according to the mandate of the Bill of Rights.

If it acts without due discretion or oppressively, the remedy is not to be sought through the Courts, but with the people, who have the power to discharge faithless agents. See *State vs. Cumb. & Penn. R. R. Co.,* 40 *Md.,* 22, and other references in the dissenting opinion in that case; *State vs. Mayhew,* 2 *Gill,* 501; *Mayor of Balto. vs. Balto. & O. R. R.,* 4 *Gill,* 292; *Providence Bank,* 4 *Peters,* 563; *McCulloh vs. State,* 4 *Wheaton,* 428; *Howell vs. State,* 3 *Gill,* 24.

Whenever it undertakes to grant the exemption from taxation, it must be clearly expressed. It must not be inferred except from necessary implication. *McCulloh vs. State,* 4 *Wheaton,* 428.

The power of taxation or exemption, being from its nature a sovereign attribute, and residing by the terms of the organic law in the Legislature, the Courts have very limited authority to direct, regulate, or trench upon its prerogative.

They are wisely relieved of the *political* duty of determining what shall, or not be the subject of taxation or exemption, or in what way the Legislature should exercise its power.

It is well that it is a political, and not a judicial function of the Government. The Legislature is the direct and authentic representative of the people, the source of power in the exercise of this high authority. They make the laws—The Courts expound them. There can be no clashing if each moves in its proper orbit.

Immunities from this vital power of taxation granted in charters of incorporation of perpetual existence, having been determined by the Courts to be contracts, or in the

nature of contracts, vesting rights accordingly; the people of this State have deemed it a proper precaution, in their organic law, to restrain the power of the Legislature upon the subject.

The 48th sec. of the 3rd Art. of the Constitution, amongst other things, provides, by the last clause thereof, "that all charters granted or adopted, in pursuance thereof, and all charters heretofore granted and created, subject to repeal or modification, may be altered from time to time, or be repealed."

The propriety of the pretension of considering the exemption of a corporation from the power of taxation, as a contract irrepealable in its nature, has been much questioned, as calculated essentially to impair, if not destroy, the indispensable and sovereign attribute of the State; the power to sustain its government by taxation.

It would seem that if exemption is construed to be in the nature of a contract, and as such irrepealable by the State, and beyond the possibility of destruction by condemnation under the power of eminent domain, it virtually amounts to the establishment of the extraordinary doctrine that the Legislature of a State, upon this subject of taxation, may contract for its surrender.

If this be true, the State may be deprived of all of its attributes of sovereignty, one after another, so far as the Legislature may have authority to bind the State by such contract.

Could the contract be disaffirmed as one against the principles of public policy?

The objections to such a pretension when applied to the power of taxation by a government are of serious import.

Fortunately for this State now, no succeeding Legislature has the authority by the grant of chartered privilege and exemption to create such contract, and to affix irrepealable limits upon its successors, but each in its succession must be left free to exercise its entire constitutional authority without such restraint.

But assuming that the Legislature, by the terms of sec. 18 of the charter, did intend to exempt, not only the stock, but the company, and that the stock was considered as representing the company and the property thereof; what is the extent thereof, or what did the Legislature intend to be exempted?

They were providing for the construction of a road from the City of Baltimore to some point on the Ohio river, by the charter granted to the company, and to exempt any capital stock required therefor, and the property it represented, *according to the concession*—whatever means, money or property were necessary *for the completion of the road*, including tracks, if necessary, to the full extent of its road-bed; with any lateral roads connecting therewith, and all necessary or useful appurtenances suitable and adapted for such a highway.

This was the extent, embracing all of its fixed property, with all necessary, useful or convenient adjuncts.

Whatever the corporation holds outside, or in excess of these reservations, is liable to taxation, according to the discretion of the Legislature, upon such theory of construction.

As to the manner of taxation, I have no doubt of the power of the Legislature to impose a direct tax upon the property of the company; or upon the gross receipts thereof, as their judgment may determine.

But conceding all this to be the *status* of the company, in regard to taxation, under the provisions of the 18th sec. of the charter, we are confronted with the grave provisions of the Act of 1835, ch. 395, and the effect to be given to the 15th sec. thereof, commonly known as the eight million loan bill.

Whilst the company is claiming that the State should deal with it, upon the highest good faith, and *uberrima fides* should be the standard, which is quite just; there must be a reciprocal obligation on its part to observe its contract.

The principles of good faith must be maintained at all events by the State with this company, as with all others of its creation.

If the exemption from taxation was granted to it by its charter, and it has since surrendered that immunity for a valuable and *bona fide* consideration, it can be held to its engagement, and to have parted with such exemption from the power of taxation.

The 1st sec. of the Act of 1835 provides, that upon the assent and agreement to the several provisions of the Act, by the Chesapeake and Ohio Canal Company, and the Baltimore and Ohio Railroad Company, these companies being the chief beneficiaries under the law, respectively, the Treasurer of the State should subscribe to the capital stock of each corporation the sum of three millions of dollars, and pay for the same in the manner and upon the conditions thereinafter mentioned. One of the conditions requires that a majority of the State directors should certify under oath, that in their opinion and judgment, such subscription by the State would, in addition to other subscriptions, be sufficient to *complete* the road to the Ohio river.

The company, by acceding to the provisions of this Act and accepting its benefits, agreed to all the provisions thereof, and solemnly stipulated to abandon any exemption from the power of taxation on the part of the State; if such be the purport of the Act, and the company has thus contracted to surrender such right to the State, if ever given to it. This subject will be found referred to in the case of the *B. & O. R. R. Co. vs. The State*, 36 *Md.*, 529.

The difficulty in that case grew out of the construction to be given to the contract between the State and company, arising out of the provision of this Act, as to the *medium* of *payment* by which the company could discharge itself from the obligation of the contract.

The State, claiming to be paid in *gold*, as it had *such coin* to pay on the bonds given to the company, treating the contract between the parties as one of indemnity. The company, on the contrary, insisting that payment could be made in *legal tender notes* of the United States. The difference in the medium of payment being some $289,489.

This was determined by this Court against the State, because of the decisions of the Supreme Court, in the cases of *Knox vs. Lee* and *Parker vs. Davis*, 12 *Wall.*, 457 **;** adjudicating that debts could be paid in *legal tender notes.* Probably, besides the consequences to this State, this decision of the Supreme Court, reversing by a bare majority the former contrary judgment of that Court, has had not only the effect to disturb the integrity of contracts, but to unsettle and derange the currency and business of the country, more then all other causes combined.

The majority of this Court rested its judgment upon the authority of that decision.

It is questionable, in my opinion, if the case had been carried to the Supreme Court, it would have determined that this case between the State and company, came within the general class of cases to which that ruling was intended to apply.

It is clear, at least to my apprehension, that it was understood by the State and the company, and all parties interested, that by this well considered Act, the State designed to become re-invested with its *original attribute of sovereignty over the subject of taxation,* if it had parted with any ; and the company, by acceptance of its provisions, intended to abandon any right to exemption. If such is not the meaning of the 15th section, it would be difficult to provide more definite terms. It is *specifically and emphatically* declaratory of such purpose. ·

The following are the terms employed in that section :

" And be it enacted, that in case it shall be necessary, at any time hereafter, to levy a direct tax for the support

State *vs.* Balto. & Ohio Railroad Co.

of Government, or to sustain the public credit, the same shall be laid according *to the* 13*th Art. of the Declaration of Rights,* including all goods, wares and merchandise, belonging to citizens of this State, ships and vessels, in or out of port, *moneys at interest on mortgage,* bond or any *chose in action, stock* and public *securities of every description,* and all income derived *from shares* of *every incorporated institution,* or otherwise, as well as every other description of property, real, personal or mixed, *which escapes taxation under existing laws; and the faith of the State is hereby pledged to pay the same accordingly, in consideration hereof,* and to provide for the payment of interest, and the reimbursement of principal of debts to be created in virtue of this Act, or of debts which may be created at any subsequent Legislature; and *all Acts and parts of Acts in contravention of the constitutional and equitable principles herein contained, shall thenceforward be repealed, abrogated and annulled.*"

Upon the passage of this Act of 1835, with its solemn and sweeping provisions, and its acceptance by the company, and the stockholders thereof, both company and stockholders, in keeping with the provisions of the Act of 1826, creating the company ; it followed as a necessary consequence, that all exemption of the company, its property, stock and franchises, if any existed under previous legislation, was absolutely and unqualifiedly surrendered to the taxing power of the State.

The company and its stockholders now occupy the same ground, and are subject to the same authority of the State as other corporations or stockholders, and must look to the Legislature for the redress of all grievances, or relief from the burden of taxation, so far as it has authority to interfere upon that subject or otherwise.

Bowie, J., filed the following dissenting opinion :

With profound respect for the great learning and ability of the Bench which decided the earlier tax cases in this State, upon which all the subsequent decisions depend, I am unable to concur in the doctrine supposed to be established by them, viz., that the shares of stock in a joint stock corporation, represent all the franchises and property, real and personal, which the corporation acquires and holds, and consequently the exemption of the shares is an exemption of the franchises and property of the corporation.

According to the best modern authorities, "A share of stock is a right to partake, according to the amount of the party's subscription, of the surplus profits obtained from the use and disposal of the capital stock of the company to those purposes for which the company is constituted." *Angell & Ames on Corp.*, sec. 557, (8th *Edition*.)

"The land, buildings ,etc., of canal, turnpike and railroad companies are the mere instruments whereby the joint stock of the company is made to produce that profit ; and, moreover, belong exclusively to the corporate body, which is altogether a separate person from the individual members." *Ibid.*, sec. 557 ; *Bligh vs. Brent*, 3 *Young & C. Exch.*, 268, 294 ; *Rex vs. The Hull Dock Company*, 1 *Term Rep.*, 219.

In the case last referred to, it was held, "that lands purchased by the company and converted into a dock, were ratable to the poor, although the Act of Parliament declared the shares should be personal estate ; the rate was upon the property in the hands of the company, and not on the share of the individual proprietor."

"The capital stock of a corporation, is not necessarily, the limit of its property." *Barry vs. Merch. Ex. Co.*, 1 *Sand. Ch.*, 280 ; *South Bay Meadow Co. vs. Gray*, 30 *Maine Rep.*, 547.

"The sound doctrine in equity is, that the capital or property, and debts due to corporations constitute a trust

fund, pledged to the payment of the dues of creditors and stockholders.'' 1 *Angell & Ames, sec.* 779 *a; Curran vs. The State of Ark.*, 15 *How.*, 312; 2 *Kent Com.*, 307, *n. a; Hightower vs. Thornton,* 8 *Georgia,* 493; *Bacon vs. Robertson,* 18 *How.*, 480.

It appears from these authorities, which might be multiplied indefinitely, that *the property of the corporation* and *the shares of stock of a joint stock corporation* are not only *not vested in the same persons,* but are essentially different things, which cannot represent each other, more than a part can cover the whole.

Figuratively speaking, a part may be put for the whole, but legally, the greater is never included in the less. In the absence of express language, susceptible of no other interpretation, we cannot impute to the Legislature any such purpose.

'' That the taxing power is of vital importance—that it is essential to the existence of government, are truths which it cannot be necessary to re-affirm. They are acknowledged and asserted by all. It would seem that the relinquishment of such a power *is never to be assumed.* We will not say, that a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, that community has a right to insist, that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it, does not appear.'' MARSHALL, C. J., 4 *Peters,* 561; adopted by the Court of Appeals in *Gordon's Ex'r vs. Mayor & City Council of Balto.*, 5 *Gill,* 231.

All persons, (*natural or legal,*) holding property in this State, are bound to contribute their proportions of public taxes for the support of the Government, according to their actual worth in real or personal property, and duties, or taxes, may properly and justly be imposed, or laid, with a *political* view, for the good government and benefit of the community. *Art.* 15, *Dec. of Rights.*

This clause of the Declaration of Rights, whilst it expressly asserts *equality* should be the general rule in imposing taxes, explicitly asserts that other taxes may be laid with a political view for the good government and benefit of the commonwealth, and impliedly prohibits exemption.

There is no clause in the Declaration of Rights, prohibiting double taxation in express terms, and notwithstanding the general rule indicated by the 15th clause above cited, which has formed a part of that Declaration, since the organization of the State, it has been the constant practice of the Legislature, to lay taxes on its citizens, not only according to their actual worth in real and personal property, but on their *business*, or *vocation; thus banks, merchants, auctioneers, corporations, hotels, theatres, lawyers* and *physicians*, have been specially taxed; and not only the learned professions, which have a species of monopoly, but the oystermen and laborer.

The transportation of passengers and freight by railroad corporations is a great franchise, immunity, or privilege, conferred by the State on the company, by virtue of its sovereign power, and founded in a great measure upon the exercise of the right of eminent domain, which may be called the "*ultima ratio*" of the civil power.

When the B. & O. R. R. Company was incorporated with a perpetual charter, designed to unite the City of Baltimore with the Ohio and the great West, the General Assembly, after investing the company, as a corporation, with the most liberal powers, declared by its 18th section, "*that the road or roads with all their works, improvements and profits, and the machinery are vested in the said company, and their successors forever*, and the shares of the capital stock of said company shall be deemed and considered personal estate and shall be exempt from the imposition of any tax or burden by the States *assenting to this law*."

The company claim exemption under this section from all taxation by the State, the City of Baltimore, or the

Counties through which the road runs, on the ground, that the shares of the capital stock are declared personal estate, and exempt from imposition of any tax or burden.

And this interpretation it is said, is fixed beyond all question by the decision of this Court in 6 *Gill*, 288, which held "that the specific property of a company was as much an ingredient in the shares of stock, and component part of their value, as is any portion of the corporate property of the company, so that if the one be exempt from taxation under express legislation, so also is the other."

It has been urged with great force that the interpretation given the 18th section, of the charter of the B. & O. R. R. Co., by the Court in 6 *Gill*, is sustained by the language of the charter granted by this State to the Potowmac Company in 1784, and the Ches. & O. C. Company in 1824.

There could not be a stronger illustration of the proposition, that exemption when intended to be given by the Legislature, is granted in clear and emphatic terms, than the examples furnished in the 9th clauses of those several charters.

These corporations were the creations of two States, erected by distinct charters in each, by inter-State legislation. They were designed to establish a great highway, between the Eastern and Western waters. There was no monopoly of the right of transportation, they were free to all who paid the tolls.

But the B. & O. R. R. Company sustains no such relation to other States, it is exclusively a Maryland corporation, with the franchises of building and working a railroad through the territory of such States as intervene between Baltimore and the Ohio.

At the meeting of the citizens of Baltimore held on the 19th Feby., 1827, preliminary to applying to the Legislature of Maryland for a charter, it was resolved, that *the assent of the Legislatures* of Pennsylvania and Virginia to

the said Act shall be obtained as speedily as possible, but shall be necessary, only so far as in constructing the said road, it shall be found necessary to pass through their respective States.

They wanted no corporate power from the assenting States, further than a right of way through the same.

To guard against any assumption of authority over the corporation or its stock, the 18th section of the charter, after declaring " it shall not be lawful for any other company or any person or persons whatsoever to travel upon or use any of the roads of the company, etc., without license or permission of the president and directors of said company, and that the said road or roads with all their works, improvements and *profits,* and all the machinery used on said road are hereby vested in the said company, incorporated by this Act, and their successors forever ; and the shares of the capital stock of the said company, shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burthen by the States *assenting to this law.*"

The plain unvarnished meaning and office of the section cited, was to assert the absolute control of the company over the road for travel and transportation; the absolute proprietorship of the corporation in its visible and tangible property, real and personal, and their profits, forever ; and the *legal status of the shares of stock to be* personal estate, (which notwithstanding the general rule is subject to the "*lex domi*" of the owner,) shall be exempt from tax by the States of Pennsylvania and Virginia.

There was no attempt to exempt the *road, works and improvements,* etc., *as such* from taxation by the assenting States, (and it is understood they have been continuously taxed in Western Virginia,) but notwithstanding the obvious distinction drawn in the law, between the road, works, etc., and the shares of stock, it is gravely contended that the real tangible indivisible property of the corpora-

tion, capable at all times of being estimated at its proper *situs*, is represented by an incorporeal, intangible, contingent interest, incapable of any certain value and distributed wherever its owners may reside, and converted into personalty—the exemption of which from taxation by the States *assenting to the law*, is an exemption by the State *enacting the law*, of all power of taxation over the corpus or body of the appellee's real and personal estate.

The exemption of *the shares of the capital stock by the assenting States*, is the exclusion of exemption as to the road, works, etc., by the enacting State, as "*expressio unius, est exclusio alterius.*"

In my judgment, the Legislature of Maryland never entertained the legal fiction, that the shares of capital stock, represented the lands, houses, road, machinery, etc.; that a part was equal to the whole—there was no judicial authority for such a position at that period, as far as I have investigated. The case of the Hull Dock Company above cited, established the contrary, viz., although the shares were made personal estate by the charter, the property in the hands of the company was liable to tax as realty.

The doctrine that the stock of a corporation, represents its whole property, originates in this State, in the decision known as the *Tax Cases*, decided in 12 *G. & J.*, 117, in which no opinion was delivered by the Court, and the propositions supposed to be sustained by the Court, are deduced by the Reporter from the arguments of the counsel, whose respective cases were affirmed, or rejected.

The most sanguine lawyer must acknowledge that this is a very unsatisfactory basis for building a theory upon, which is to control the legislation of the State forever.

The doctrine was repeated in the case of *Gordon vs. The Mayor & City Council of Balto.*, 5 *Gill*, 231, and no authority cited, except 12 *G. & J.*, and thus sounded, the refrain was taken up and repeated in the case of *The*

*Mayor, &c. of Balt. vs. The B. & O. R. R. Co.*, 6 *Gill*, and others since determined on its authority.

No chain can be stronger than each of its several links, and if the first is unsound, the whole series is so.

Although many cases are to be found in other States, in which language may be employed, corresponding with that used by the Court in 6 *Gill*, yet many of those were cases of banking corporations, or others, in which the capital stock, valued at par, might, without any violation of principle, be said to represent all the property of the corporations, but the weight of authority in the United States and in England, as collected and cited in the appellant's briefs is otherwise.

I am painfully conscious of the responsibility which a Judge incurs in departing from former decisions of a Court of final resort.

The rule "*stare decisis*," is one of the most sacred in the law. It is not a wise administration of justice to oppose a current of authorities, where they are to be found. Authorities established are so many laws, and receding from them, unsettles property, etc.

"The Judges now (as their predecessors have always done,) bow down to the rule (of *stare decisis*,) '*pro salute populi*'—which is the supreme law of every community." What the safety of the commonwealth demands, is a momentous problem.

Whether it is better to persist in error, than to review and correct it, is the position those are placed in who believe the former decision wrong. The author on Legal Judgment says, "it may often be difficult to draw the line, at which it must be considered that a doctrine is settled, or a point closed, and therefore to be adhered to ; or to say when it is not too late to review such doctrine or point. There may be a time when it is not too late to make that review. My own personal experience tells me, says Graham Brun, that nothing is more common, than

that a legal notion, though founded on judicial decisions, may prevail for a series of years in Westminster Hall as being of decided cases, which have been decided to be wrong, and when so discovered, has been corrected by subsequent determinations."   \*   \*   \*   \*

"The case of *Moses vs. Macferlan*, was considered for law between thirty and forty years, till the Court, reconsidering the grounds of that decision, overruled it altogether and came back to the true principle in the case of *Marriot vs. Hampton*, where Lord KENYON and the rest of the Court individually, refused to recognize the law of the former case, although very solemnly determined after mature consideration and an elaborate judgment." *Ram on Legal Judgment*, 128, 129, 130.

This is not, strictly speaking " *res judicata*," but "*res integra*." In 6 *Gill*, the doctrine of exemption as applied to the appellee in this case, was first announced in a suit between the Mayor and C. C. of Balto., and the appellee. The direct question there, was whether the City had the power to tax.

It was held, the stock being exempted from State taxation, "*a fortiori*" the City, which was but a municipality of the State, had no power to tax.

The State was no party to that suit, and was not bound by it, and no occasion has arisen since requiring the doctrine to be reviewed. It is in fact "*res integra*" as to the State. The parent case 12 *G. & J.*, 117, from which the doctrine sprung, was prolific of various propositions, some of which are denied by those who insist on 6 *Gill* as authority.

The 7th section of the Act of 1821, ch. 131, required the banks to pay a certain bonus for the extension of their charters, and the 11th declared that upon any of them accepting and complying with the terms of the Act, the faith of the State was thereby pledged not to impose any further tax or burden upon them, etc.

These sections were held to exempt the banks from further tax or charge by the State, *for their franchise or banking privileges*, but not to *exempt the property belonging to such banks*, or *the shares of stock held therein by individuals;* drawing a broad distinction between the *franchise*, and the property and shares, declaring the exemption of the one is not the exemption of the other.

From the proposition declared in that case, that "the property of the bank being represented by the shares of stock therein, both cannot be taxed, and therefore when the tax is imposed on the stock in the hands of shareholders, the property of the bank, real or personal, cannot be taxed," DORSEY, J., is represented as dissenting.

Yet, this proposition is the gist of the whole opinion of the Court delivered by him in 6 *Gill*.

The 11th section of the Act of 1821, ch. 131, declared "that upon any of the aforesaid banks accepting and complying with the terms and conditions of this Act, the faith of the State is hereby pledged not to impose any further tax or burden upon them, during the continuance of their charter under this Act."

The banks contended that this clause restrained not only the Legislature from imposing additional taxes upon the banks, but also the city from assessing them.

This construction of the clause was repudiated by the Court, which held that the exemption could not be allowed, unless the Court was satisfied "that an intention to liberate the bank from *city* as well *as State taxation, is clearly and indisputably expressed.*"

This proposition they held was established by adjudications both in England and the United States, which were cited at considerable length, and with these for their guide they declared, that although the Act exempted the banks from *State* taxation, it did not exempt them from city taxation, "that the exemption claimed by the appellant cannot be sustained unless the Court is satisfied that

an intention to liberate the bank from city, as well as State taxation is *clearly* and *indisputably* expressed ;" * * "if the object of the contract had been as is maintained by the counsel for the appellant, to exempt the banks from *all* taxation whether imposed by the State or city, it is impossible to believe that the parties would not have employed more comprehensive terms, and have used language better calculated to accomplish their purpose."

Apply this principle of construction to the 18th section of the charter of the appellee, and what is the necessary conclusion?

Are the States assenting to the law, and the State enacting the law the same? Are they not as distinct as the City and the State governments? Is the intention to liberate the visible property of the corporation from taxation clearly and *indisputably* expressed? Does it appear beyond all doubt and ambiguity, that the State of Maryland meant under this vague implication to divest itself forever, of one of the vital powers of sovereignty?

In the language of the Court in 5 *Gill*, 239, paraphrazed, " on this point *my* opinion is adverse to the claim asserted by the appellee."